IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GLOBAL EXECUTIVE MANAGEMENT                    No. 3:16-cv-00370-HZ
SOLUTIONS, INC., an Oregon corporation,

        Plaintiff,

    v.

INTERNATIONAL BUSINESS MACHINES                OPINION & ORDER
CORPORATION, a New York corporation,

        Defendant.

Richard S. Yugler
Thane W. Tienson
LANDYE BENNETT BLUMSTEIN LLP
1300 S.W. Fifth Avenue, Suite 3600
Portland, Oregon 97201

      Attorneys for Plaintiff

Clifford S. Davidson
Kristen G. Hilton
SUSSMAN SHANK LLP
1000 S.W. Broadway, Suite 1400
Portland, Oregon 97205-3089

Richard I. Werder
Rachel E. Epstein
Donald J. Reinhard, II
QUINN EMANUEL URQUHART & SULLIVAN
51 Madison Avenue, 22nd Floor
New York, New York 10010

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Global Executive Management Solutions, Inc., (Plaintiff or GEM), brings this contract-based action against Defendant International Business Machines Corp., (Defendant or IBM), seeking payment for work performed by Richard Clyne, one of GEM's owners. Plaintiff brings claims of breach of express contract, breach of the implied duty of good faith and fair dealing, quantum meruit, promissory estoppel, accounting[1], and fraud. Defendant moves for summary judgment on Plaintiff's remaining claims.

Plaintiff moves for partial summary judgment on three of Defendant's affirmative defenses.[2] I grant Defendant's motion as to the breach of contract claim, the implied of good faith and fair dealing claim, and the promissory estoppel claim. I deny Defendant's motion on the quantum meruit and fraud claims. I grant Plaintiff's motion on the waiver affirmative defense and deny it on the estoppel and express contract affirmative defenses.

---

[1] Based on representations made in the summary judgment briefing, Plaintiff seeks dismissal of the accounting claim.

[2] Plaintiff moves against the affirmative defenses of "estoppel/waiver" (pleaded as a single affirmative defense), unclean hands, and express contract. In conferring about the motions, Plaintiff confirmed it pursues only legal claims and seeks no equitable relief. As a result, Defendant agrees that its unclean hands affirmative defense is moot, which in turn moots Plaintiff's motion. Plaintiff agrees. I deny Plaintiff's motion directed to the unclean hands affirmative defense as moot.

BACKGROUND

In addition to the named parties, this cases involves two other entities and various contractual relationships among the parties and those entities. I have set forth the factual background in a way that helps make sense of who the players are and how they are related.

## I. Clyne & Plaintiff

Clyne worked for Defendant for thirty years, from 1970 to 2000. Epstein Feb. 10, 2017 Decl. ("Epstein First Decl.") Ex. E ("Clyne Dep.") 44:18-45:13; 45:21-25, 52:6-16, ECF 72.[3] Clyne and his wife incorporated Plaintiff in approximately 2001. Stewart Feb. 10, 2017 Decl. ("Stewart First Decl.") Ex. E ("Clyne Dep.") 53:12-18, ECF 77; Cline Dep./Epstein First Decl. at 58:19-23. Clyne considers himself a specialist in negotiating complicated, interesting matters. Cline Dep./Epstein First Decl. at 163:24-164:10; *see also id.* at 48:2-16 (noting his management skill strengths while at IBM and that he purposefully sought out things that were "messed up" and he would "step forward"). Through GEM, Clyne provides contract negotiating services as a consultant.

## II. Defendant's GTS Division & Its Relationship with BMC

Defendant provides IT services to clients. Epstein First Decl. Ex. B ("Stafford Dep.") 28:5-6. Global Technology Services (GTS) is a division of IBM which takes over and runs IT

---

[3] Deposition excerpts for several individuals are submitted by both parties as attachments to declarations. In my first cite to a deposition excerpt, I note the page and line for the specific reference and include a full cite to the declaration exhibit to which the deposition excerpt is attached, along with the declaration's ECF docket number. Subsequent references are to *Id.* or are abbreviated as "Clyne Dep./Epstein First Decl." or "Clyne Dep./First Stewart Decl.," as the case may be, followed by the page and line number. There are also multiple declarations by the same individual. Initially, I identify a particular declaration by date filed and give the ECF docket number. Subsequent references are to "first," "second," etc. as indicated.

operations for customers. *Id.* at 7:24-8:1; Epstein First Decl. Ex. A ("Calo Dep.") 14:13-25.

BMC Software, Inc., (BMC), provides software that Defendant's GTS Division uses to provide IT services to its clients. Stafford Dep./Epstein First Decl. 28:5-16. BMC has done so for about twenty years. Epstein First Decl. Ex. C ("Jones Dep.") 9:14-17.

## III. BMC Contracts with IBM

IBM spends roughly $90 to $100 million per year with BMC, Jones Dep./Epstein First Decl. 135:25-136:3, and is one of the largest third-party suppliers IBM works with. Stafford Dep./Epstein First Decl. 28:15-16. In 2008, BMC and IBM entered into a Master Licensing Agreement (MLA) and an Outsourcing Attachment (OA) thereto ("the 2008 OA").

In 2012 or 2013, IBM and BMC began to renegotiate the 2008 OA. During those negotiations, BMC alleged that IBM had not complied with certain provisions of the 2008 OA and claimed that IBM's total exposure as a result was roughly $1.2 billion. *Id.* at 136:8-17; Epstein First Decl. Ex. AA at 9. Nonetheless, IBM and BMC executed a new OA in 2013 ("the 2013 OA"), which had a "[t]otal deal value [of] approximately [$]102 million." *Id.* at 137:15-21; Epstein First Decl. Ex. BB.

In 2014, IBM and BMC started the "BMC Negotiations" which, according to Defendant, were "commercial discussions" regarding IBM's desire for certain additional rights. Def. S.J. Mem. 9, ECF 71. As part of these negotiations, BMC again alleged that IBM had significant exposure, this time for alleged noncompliance with the 2013 OA. *See* Stewart First Decl. Exs. 50, 51, 52. The total estimated exposure for IBM was $1,097,846,099. *Id.*, Ex. 50 at 16; Stewart First Decl. Ex. D ("Jones Dep.") 21:3-4. In February-March 2015, and as discussed in more detail below, IBM brought Clyne in to help with the BMC Negotiations which concluded with a

new 2015 OA executed on September 30, 2015. This lawsuit is about Plaintiff's compensation for the time Clyne spent on the BMC Negotiations.

IV. IBM's and Plaintiff's Contracts with APC

    A. IBM's Relationship with APC

    For consultants such as Plaintiff, IBM frequently uses a third-party staffing company named Alliance of Professionals & Consultants (APC) to hire and manage the consultant. Epstein First Decl. Ex. F ("McGauvran Dep.") 133:6-9. At the time relevant to this lawsuit, IBM and APC were parties to a "Non Technical Services Agreement," effective November 19, 2012. Epstein First Decl. Ex. I. Under that agreement, APC provides "deliverables and services" as described in "Statements of Work" and/or "Work Authorizations" to IBM. *Id.* at 1. The agreement defines the relevant terms, including "deliverables," "statement of work," "services," and "work authorization." *Id.* at , ¶ 1.

    Simultaneous with the execution of the Non Technical Services Agreement, IBM and APC also executed a "Business Services Master Statement of Work To the Non-Technical Services Agreement" (hereinafter "Master SOW"). Epstein First Decl. Ex. H. In contrast to the Non Technical Services Agreement which lacked an expiration date, the Master SOW expressly expired two years after its execution, on November 19, 2014. *Id.* at 1. The Master SOW incorporates the terms and conditions of the Non Technical Services Agreement. The Scope of Work section establishes that the services or deliverables required to be provided either on IBM's or IBM's Customers' premises as specified in a work authorization, are "Business Services." *Id.* at 1, ¶ 1. "Accordingly, APC or APC's Subtiers" were obligated to provide personnel to IBM in several service areas, including custom market research, database marketing, IT consulting,

marketing consulting, operations consulting, research, strategy consulting, and more. *Id.* The Master SOW defines relevant terms such as "subtier," "personnel," "recruited personnel," and "non-recruited personnel." *Id.* at 1, ¶ 2. Under the "Summary Description of Services," APC agreed to provide either recruited or non-recruited personnel or to align with subtiers as specified in individual work authorizations issued by IBM. *Id.* at 2, ¶ 3.

B. Plaintiff's & APC's Relationship

Clyne, through Plaintiff GEM, worked for American Express for a few years from October 2010 to the end of 2013. Clyne Dep./Epstein First Decl. 29:11-22, 31:7-11. Sometime in the fourth quarter of 2013, IBM's Andrew Cohen reached out to Clyne for assistance with negotiating the "BMC Midrange contract." *Id.* at 103:19-25. At the time, Cohen was IBM's software manager for its American Express service account. *Id.* at 83:7-11; *see also* Epstein First Decl. Ex. K at 2 (email from Cohen bearing title Delivery Project Executive, American Express Account Integrated Technology Delivery). Cohen asked Clyne for a fee quote which Clyne provided in a November 25, 2013 email. *Id.* at 104:2-4, 9-11; Epstein First Decl. Ex. J. Cohen responded via email in early December, telling Clyne he needed to go through an approved staffing firm, several of which he listed in the email. *Id.* Ex. K. In his deposition, Clyne testified that Cohen later clarified through email or telephone that APC was the correct contracting vendor. Clyne Dep./Epstein First Decl. 117:9-14.

On January 15, 2014, IBM's Les Bengough, who worked as the Business Services Team Lead for IBM's General Procurement office, emailed Lori Colmenero, Client Coordinator at APC, regarding the contract for Plaintiff. Stewart First Decl. Ex. 126. Bengough cc'd Clyne and IBM's Cohen. *Id.* Bengough told Colmenero that contact details and the statement of work for

the "subject contractor," identified as Clyne, were attached, a "cart" would follow, and to please align with APC. *Id.* GEM's previous quote to Cohen was attached. *Id.* APC's Matthew McGauvran explained that typically IBM Procurement introduces APC to an individual or company IBM wants for a specific project and then has that individual or company "align" with APC for that project. Stewart First Decl. Ex. A ("McGauvran Dep.") 12:19-21. "Alignment" means APC's hiring of the company by signing all of the documents and "all of the legal requirements to do business with APC, and therefore, IBM." *Id.* at 13:2-5.

On January 28, 2014, Clyne executed a "Master Supplier Agreement" (MSA) with APC, identifying GEM as the "Supplier." Stewart First Decl. Ex. 3. Under the MSA, APC may contact the Supplier if an opportunity arises that APC believes may require the Supplier's services. *Id.* Another introductory paragraph makes clear that the MSA comprises a number of documents in addition to the MSA, including any statement of work referring to the MSA and accepted by the supplier and any work authorization or change order for a statement of work issued by APC. *Id.* "Collectively, these documents govern the relationship between Supplier and APC for any Services Supplier provides to APC or its Clients." *Id.* The MSA had a two-year term, with automatic renewal for successive one-year terms. *Id.* at 3, ¶ 5.1.

A non-compete provision in the MSA states as follows:

> If APC introduced Supplier to the Client, Supplier agrees not to establish or attempt to establish a sales relationship or provide Services, directly or indirectly, to the Client except through APC during the Term of the Master Supplier Agreement and for a period of one (1) year, thereafter. APC will be deemed to have introduced Supplier to the Client unless Supplier can demonstrate that Supplier provided services to the Client, directly or indirectly, during the twelve months before the date Supplier first submitted candidates to the Client through APC. If You provide, directly, or indirectly, any Services in violation of the Master Supplier Agreement to the Client, Supplier must pay to APC a "Finder's

Fee" equal to thirty percent (30%) of all billings for Services or thirty percent (30%) of the annual salary for personnel provided as a permanent placement.

*Id.* at 3, ¶ 3.4.  A separate section addresses "Confidentiality Obligations."  *Id.* at 6, ¶ 9.

Also on January 28, 2014, Clyne signed a "Statement of Work Master Supplier Agreement" (hereinafter "the GEM SOW").  Epstein First Decl. Ex. M.  It begins by stating that the GEM SOW "describes the specifics of the work assignment for the Client Engagement referenced below."  *Id.*  "APC's Purchase Order is your authorization that the Client has accepted the Professional listed below and Your authorization for Your Personnel to begin work and invoice APC."  *Id.*  GEM is identified as the Supplier with Clyne identified as the Account Manager.  *Id.*  "IBM (Business Services)" is identified as the Client.  *Id.*  Clyne's title is "Negotiator" and he had a $220 per hour billing rate.  *Id.*  The estimated start date is February 3, 2014.  *Id.*  Under "Additional Engagement Information," a description of the work is provided: "Negotiating BMC Midrange servers renewal.  Includes prep, due diligence, internal support meetings, vendor negotiations, & travel."  *Id.* at 2.

The next day, January 29, 2014, Clyne signed a "Confidentiality, Non-Solicitation and Non-Compete Agreement for Supplier Professional" ("January 2014 Confidentiality/Non-Compete Agreement").  Epstein First Decl. Ex. N.  This agreement requires GEM to keep confidential any Client information provided during GEM's engagement with APC.  *Id.* at 1, ¶ 1.3.  It also includes another non-compete provision in which Clyne agreed that during the term of employment with APC and for six months thereafter, he would not directly or indirectly solicit or accept a contractual or consulting engagement or employment on a full or part-time basis for similar services with any APC Client.  *Id.* at 3, ¶ 3.1.

On January 30, 2014, APC Account Manager McGauvran emailed Bengough with IBM Procurement to tell him that GEM was now aligned with APC as a Business Services supplier and that Clyne would provide the services which were identified in the GEM SOW. Stewart First Decl. Ex. 126. McGauvran said the start date was "ASAP," expenses were "[a]ctual and "[r]easonable," and APC could "provide these services at a bill rate of $226.60 per hour." *Id.*

Troy Roberts is APC's President. Stewart First Decl. Ex. B ("Roberts Dep.") 6:13-14. He explained that typically at the beginning of an APC engagement, there is a Statement of Work stating what is going to be provided for a given role. *Id.* at 34:7-9. When IBM has specific services it wants to procure from the resource it wants to engage, IBM Procurement works out "the deal" and then contacts APC and asks APC to engage that supplier. *Id.* at 35:14-36:8. Roberts explained that while the Statement of Work specifies what the person is going to do, a purchase order is the actual work authorization to perform the work. *Id.* at 74:7-14. Usually IBM issues a purchase order to APC and then APC issues a purchase order to its supplier. *Id.* at 113:7-11.

On February 3, 2014, IBM issued a Purchase Order to APC for Clyne's services. Stewart First Decl. Ex. 12. The next day, APC's McGauvran sent Clyne an email telling him "your PO arrived this morning" and further, that it was created with 900 hours of funding and an additional 100 hours of overtime funding at the same rate. Epstein First Decl. Ex. 0; *see also* Stewart First Decl. Ex. 13 at 2 (APC Purchase Order dated Feb. 18, 2014 showing GEM as the vendor, the start date as February 5, 2014, the total number of hours as 1000 (900 "ST" and 100 "OT"), at a unit price of $220 for a total of $220,001, with the extra single dollar allowed to "Exp"). In response to McGauvran's request that Clyne confirm his start date, Clyne responded that he was

going to start work that day.  *Id.*

Operating under these particular agreements (the MSA, the GEM SOW, the January 2014 Confidentiality/Non-Compete Agreement, the Purchase Order from IBM to APC, and the Purchase Order from APC to GEM), Clyne performed work for IBM.  He negotiated the American Express BMC midrange server contract.  Clyne Dep./Epstein First Decl. 145:8-21; Epstein First Decl. Ex. Q at 1-5 (showing hours spent by Clyne between February 5, 2014 and April 4, 2014 on BMC Midrange Agreement).

He also worked on projects called "IBI Due Diligence"/"IBI Renewal Negotiations," "BMC PCP Compliance Issue," and "BMC MF Renewal"/"BMC mainframe renewal."  Epstein First Decl. Ex. Q at 5-34.  The bulk of this work was performed in 2014 with some hours performed into May 2015.  *Id.*  As Clyne testified in deposition, after the success of the midrange server contract, Cohen was "absolutely delighted" and asked him to negotiate the IBI renewal. Clyne Dep./Epstein First Decl. at 146:12-17.  These were different negotiations than the BMC midrange negotiation but Clyne still submitted his time through APC because the work was still related to American Express.  *Id.* at 146:18-25.  Clyne explained that even though this next project was not BMC, because the arrangement with Cohen was for American Express only and IBI was the next such contract, he had no problem continuing to negotiate under the documents he had with APC.  *Id.* at 147:3-24.  Cohen and Nancy Bakarich, whom Clyne stated were both with IBM's software team/American Express, also asked him work on the BMC PCP Compliance Issue.  *Id.* at 150:13-18.  The GEM SOW was not amended to reflect the BMC PCP Compliance Issue project and Clyne does not recall getting a new statement of work for the IBI project.  *Id.* at 149:8-12; 150:19-23.

V.  Clyne/GEM's Efforts to Secure Additional IBM Work

In a July 2014 email exchange with APC's McGauvran, Clyne told McGauvran that his "PO isn't half consumed for this year and it looks as if a major negotiation will be required to be completed before the end of the year (possibly consuming the remaining 500+ hours in this year's PO by IBM)."  Epstein First Decl. Ex. R.  There's also subsequent years which I will be talking to Andrew [Cohen] about . . . re: if IBM has interest in a multi-year contract or not."  *Id.*

Shortly thereafter, Clyne discussed the status of "this year's PO" with Cohen and his need to engage senior executives about a multi-year contract for negotiating large or difficult contracts.  Epstein First Decl. Ex. S.  Clyne also mentioned that he expected to raise his hourly rate for "AMEX (and now IBM)" to his new "discounted" rate of $280 per hour.  He added that this new proposed rate was negotiable if IBM was wiling to commit to a multi-year contract which guaranteed at least 1,800 hours annually.  *Id.*

In August 2014, Clyne also contacted APC's McGauvran to inquire about other client opportunities through APC.  Epstein First Decl. Ex. G.  He also told McGauvran that he was making calls elsewhere in IBM to see if there was interest in picking up the PO and to issue a 2015 PO.  *Id.*   In deposition, Clyne was asked to explain the statement that he was making calls elsewhere in IBM to see if there was an "interest in picking up this PO and issue a 2015 PO."  Clyne Dep./Epstein First Decl. 168:3-6.  Clyne testified that he meant "[j]ust what it said."  *Id.* 168:7.  He then went on:

> The PO is an American Express PO, and since I had been informed there would be no additional work forthcoming that there may be somebody that wanted to use the hours that were on the PO or whatnot.
>     It would take a transfer.  It's a very involved process, I'm told, but again, it was exactly the same vein.  It's if somebody has another account, if somebody had

another account, it may be – again, I'm not familiar with procurement's procedures in this whole process, but it's possible that it just may be easier for somebody that has negotiating skills to just call up Andrew Cohen and say reassign the PO to me.

*Id.* at 168:7-22.

In early September 2014, Clyne emailed Cohen to mention again that he was going to raise his rates for the following year but still offering "various rates and payment options, in different contractual constructs, for IBM to consider and decide upon this fall for extending services beyond the end of the year." Epstein First Decl. Ex. T at 4.  He asked Cohen if Cohen had any interest in receiving proposals for his services beyond the fourth quarter of 2015.  *Id.*

Cohen responded by confirming interest in retaining Clyne to help negotiate some of our "key, large SW contracts with 2015/16 expiration dates," but noted the "intense focus" by IBM on expenses and stated it could be difficult to get approval for an increased rate.  *Id.* at 3. Nonetheless, Cohen asked Clyne to forward any proposals for engagement beyond 2014.  *Id.*

Clyne followed up with an October 1, 2014 email to Cohen with three proposals, one of which, "Option 3," suggested a payment structure where Clyne would receive 3.75% of all savings/cost avoids achieved.  *Id.* at 1.  This option would require minimum vendor contract values or claims of at least $100,000,000 per year before negotiations for each of two years.  *Id.* Under Option 3, Clyne would pay all travel expenses.  *Id.*  In deposition, Clyne testified that Cohen responded to Option 3's contingency arrangement by indicating that it might be something to consider some day, but "given the climate now . . . we could never accept that now."  Clyne Dep./Epstein First Decl. 82:14-83:6 (noting that this was the "gist" of Cohen's response).

In December 2014, Clyne emailed Cohen to state that APC had confirmed that Clyne's PO had been extended by IBM in October and that 1,200 additional labor hours were added.

Epstein First Decl. Ex. V.  As a result, there were approximately 1,350 hours remaining to be

"consumed on the current PO[.]" *Id.*; *see also* Clyne Dep./Epstein First Decl. 190:8-9 (Clyne

stating in deposition that did not know why he wrote 1,350 hours instead of 1,297 hours).  He

also committed to not raising his IBM hourly rate for 2015 after all.  Epstein First Decl. Ex. V.

VI.  Clyne's February - March 2015 Conversations with Patterson and Calo

Continuing his quest for additional work, in February 2015, Clyne emailed Richard

Patterson, a former IBM colleague.  Epstein First Decl. Ex. X.  Patterson is the General Manager

for GTS Infrastructure Services for IBM's GTS Division.  *See* Stewart First Decl. Ex. 217.  Clyne

hired Patterson thirty years earlier but had not spoken to him for about twenty years.  Clyne

Dep./Epstein First Decl. 195:3-11.

In the email, Clyne told Patterson that he had negotiated software contracts at "GTS'

American Express Account for 11 years now."  Epstein First Decl. Ex. X at 1 (noting this

occurred for IBM from 2004 to 2010, for American Express from 2010 to 2014, and then again

for IBM from February 2014 to the present).  He suggested that GTS was not "achieving

anywhere near what it could if it skillfully negotiated and effectively managed the negotiating

process, for software agreements, at its SO accounts." *Id.*  Clyne opined there were "profound"

possibilities for dramatically reducing overall delivery costs. *Id.*  He noted that he had an open

PO with IBM at the American Express account today, but it was limited in hours and "further

restricted in its use due to the cost reduction measures currently applicable to contractors." *Id.*

He told Patterson that Cohen was his assigned IBM manager. *Id.*  Clyne summarized his

achievements for IBM in the prior year and offered to discuss an approach that would be,

"considering the above," of no risk to IBM. *Id.*  He asked Patterson to meet him in person at

Patterson's convenience to discuss.  *Id.*  In a post-script, he added that he did not believe it best for Patterson to share the email with IBM Procurement until after the two had met.  *Id.* at 2.

Patterson understood Clyne's email as "reach[ing] out regarding work he was doing at American Express, and an opportunity . . . to apply what he had done at American Express more broadly for GTS."  Stewart First Decl. Ex. I ("Patterson Dep.") 16:25-17:5.  Patterson wrote back to Clyne, stating he would be glad to have a conversation and further, that he knew that the "GTS team at AMEX saw value in the role you played."  Stewart First Decl. Ex. 212.  He suggested talking on the phone.  *Id.*

Patterson and Clyne spoke on February 18, 2015.  Clyne Dep./Epstein First Decl. 209:25-210:5; Stewart First Decl. Ex. 219 at 2.  Clyne told Patterson that GTS was "leaving money on the table" in negotiating with software vendors like BMC.  *Id.* at 207:5-10; *see also* Epstein First Decl. Ex. D ("Patterson Dep.") 19:14-18.  Clyne told Patterson he had "hours left on his PO."  Patterson Dep./Epstein First Decl. 19:17-28.  They talked about the opportunity to "apply" Clyne to a "broader set of software discussions" and not just "to Amex."  *Id.* at 19:19-21.  They discussed "how to . . . work with [Clyne] on the software negotiations."  *Id.* at 20:14-17.

Clyne and Patterson also spoke about whether there were alternate ways to pay or "compensate around negotiating software contracts."  *Id.* at 20:21-25.  This included the possibility of a contingency arrangement.  Clyne Dep./Epstein First Decl. 210:24-25.  According to Clyne, Patterson inquired if Clyne would be willing to perform his services under a "bounty agreement."  *Id.* at 210:17-20.  Clyne clarified whether Patterson meant a contingency agreement.  *Id.* at 201:21-25; *see also id.* at 211:2-25.  Clyne indicated that he was "heading that way anyway, which I was, with the no risk[.]" *Id.* at 212:2-4.  Patterson recalled a conversation about a

contingency fee, but said it was not specific and was part of a "brainstorming set of conversations." Patterson Dep./Stewart First Decl. 21:20-25. Because the GTS Division was looking at alternative ways to save money on non-labor, the timing was right. *Id.* at 22:10-23:2. They discussed "a percentage fee or something around how to pay for this particular part of negotiating." *Id.* at 21:5-8. Patterson did not recall using the word "bounty fee" but remembered that a contingency fee was part of the conversation. *Id.* at 29:4-11.

Patterson told Clyne that negotiations for software contracts were not in his area anymore but he agreed to introduce him to Yvonne Calo because this was her responsibility. *Id.* at 19:23-20:2. Calo is IBM's Vice-President of Resiliency and Infrastructure Delivery within the GTS Division. Calo Dep./Epstein First Decl. 6:24-7:2; 15:2-7. Software and hardware as non-labor-related costs were part of her responsibilities. Patterson Dep./Stewart First Decl. at 20:6-8. Patterson told Clyne that he was confident Clyne could help out, there were some people he wanted to talk to, and that he would get back to Clyne within a week. Clyne Dep./Epstein First Decl. at 209:7-13; 211:8-11.

Patterson introduced Clyne and Calo during a February 25, 2015 phone call. Clyne Dep./Epstein First Decl. 213:3-15. Patterson told Calo and Clyne during the call that Clyne had had success with American Express and Patterson thought there was a "potential opportunity to leverage Rick more broadly in negotiating, . . . similar contracts for the broader IBM." Patterson Dep./Stewart First Decl. 65:3-16. After Patterson said that BMC was "particularly problematic," Patterson left the call which Calo continued. Clyne Dep./Epstein First Decl. at 213:3-25.

Calo remembers learning nothing from Patterson before the call other than that the call was with someone who might help with software negotiations. Stewart First Decl. Ex. H ("Calo

Dep.") 21:7-10; 22:4-9.  Calo felt that she needed to introduce Clyne to Joe Dzaluk who "owned all software negotiations at the time, not just BMC."  *Id.* at 27:18-24.  In a March 6, 2015 email, Calo wrote to Clyne that she and Dzaluk wanted to look at current contracts and agreements like BMC to determine if there were any opportunities to negotiate savings, and further, that she and Dzaluk would like to take Clyne through the current agreement and issues with BMC and get Clyne's perspective.  Stewart First Decl. Ex. 183 at 2.  She asked Dzaluk to forward material to Clyne to review in advance of a meeting.  *Id.* at 3; *see also* Calo Dep./Stewart First Decl. 34:19-20 (Calo stating that in March 2015 she asked Dzaluk to brief Clyne on the BMC work).  At that point, Clyne started work on the project.  *Id.* at 35:5-16; *see also* Stewart First Decl. Ex. 48 at 2 (time sheet by Clyne showing start date of March 10, 2015 on "BMC w/Yvonne Calo, Joe Dzaluk, John Stafford").

VII.   Compensation and Terms of Employment

Calo was unable to recall specifics about the discussions among Patterson, Dzaluk, herself, and others, regarding bringing Clyne on to assist with the BMC Negotiations and thus, there is no testimony from her about discussions regarding Clyne's compensation at the start of his work on the BMC Negotiations.  Calo Depo./Stewart First Decl. 28-35.  From the earlier electronic meeting notice she received from Patterson, Calo knew that Clyne was "already in IBM with access and an ID" which meant to her that he was "through IBM, a contract and on our books."  *Id.* at 36:7-18.  She does not remember discussing Clyne's existing status with Patterson or anyone else.  *Id.* at 36:19-37:6.  She does not remember asking Clyne about his status.  *Id.* at 37:7-10.  It was not until after the BMC Negotiations had concluded and a new BMC agreement signed on September 30, 2015 that she inquired of Clyne about what contract he had.  *Id.* at

37:16-22.  She did not ask previously because he was "already on the books, available with hours and excess time to provide counsel and help on another project, and so he was assigned accordingly."  *Id.* at 37:21-38:3.  Although she could not remember who had told her that Clyne was available with "extra cycles to help with our software negotiations," she assumed it was Patterson.  *Id.* at 38:4-15.  She made no inquiry about Clyne's number of available hours between the day of the call with Patterson in February 2015 and September 30, 2015; she did nothing to increase the hours for the project; she did not inquire if Clyne was adding his hours or submitting his hours.  *Id.* at 39:16-40:5.  She believed these issues were the responsibility of Clyne's first-line manager who was Cohen and then Jeromy Smith.[4]  *Id.* at 40:7-11.

Calo described the usual process of hiring a contractor as receiving resumes and candidates from IBM Procurement with IBM Procurement "on-board[ing]" the selected candidate to make sure everything is in place.  *Id.* at 44:2-15.  Calo did not go through the usual process in bringing Clyne on because he was "already on the books."  *Id.*  To her, because Clyne had an ID, he "[t]herefore had a contract."  *Id.* at 44:16-17.  She did not know if Clyne's current contract applied to the work he would perform for her.  *Id.* at 44:18-45:6.  She knew he was assigned to American Express which uses BMC so she knew he had knowledge of BMC and that he had done BMC work specific to the American Express account.  *Id.* at 45:12-14.

On March 6, 2015, John Stafford, the GTS Division employee in charge of the software spending component of the services provided by the GTS Division, emailed Clyne to introduce

---

[4]  A first-line manager at IBM apparently oversees a consultant's logistics.  *E.g.*,  Calo Dep./Epstein Decl. 40:7-9 (approving expenses is responsibility of first-line manager); 52:8-14 (first-line manager "owns" the purchase order and the budget for a contractor).  From February 2014 to March 2015, Clyne's first-line manager was Cohen who was then replaced by Smith.  Clyne Dep./Epstein Decl. 83:7-21; Epstein Decl. Ex. UU at 2.

himself as being on Dzaluk's team, inquired if Clyne needed information in advance of the meeting, and offered to discuss the status of the current dispute and BMC's overall contract structure. Epstein First Decl. Ex. Y; Stafford Dep./Epstein First Decl. 7:14-17, 7:24-8:7, 10:12-15. Clyne responded by identifying what he needed and then raised the issue of a non-disclosure agreement (NDA) by stating that he already had a signed NDA "regarding all matters having to do with IBM" and so would treat IBM documents appropriately as to their high confidentiality restrictions. *Id.* A few days later, Stafford emailed IBM's in-house counsel Thom Hagen and Anthony Gargano to tell them about bringing Clyne on to "take a more active role in leading the business aspects of any negotiation/settlement" and to inquire whether, because Clyne was a contractor, there was anything special that needed consideration. Epstein First Decl. Ex. JJ at 2. He noted Clyne's statement that Clyne already had a NDA in place. *Id.*

Hagen responded that it was "probably fine" but he wanted to see the NDA. *Id.* Clyne then asked McGauvran for a "soft copy of the IBM NDA" that he signed "during the onboarding process last February[.]" Epstein First Decl. Ex. KK at 2. McGauvran responded by asking Clyne what was going on and if there was anything "we" should be aware of. *Id.* McGauvran attached a copy of the MSA Clyne executed in January 2014 which included non-disclosure language. *Id.* Clyne responded that there was an "expanded assignment with IBM" which needed a "full IBM NDA" which Clyne was certain he had completed, meaning a stand-alone NDA for IBM. *Id.* He wondered whether the existence of the document "here" (presumably referring to the MSA McGauvran attached to his email), which referenced a separate NDA, meant that "APC had no such document on hand (executed by me)?" *Id.* McGauvran responded that he was glad to hear that a project was in the works. *Id.* McGauvran attached something that

is not named in the email but which Defendant identifies as the January 2014 Confidentiality/Non-Compete Agreement. *Id.;* Def. S.J. Mem. 12. McGauvran stated that he did not have a stand-alone document. *Id.* If the client was requesting one, he wrote, it could be added to Clyne's documents in APC's system. *Id.* Clyne thanked McGauvran, suggested that the agreement McGauvran provided was the document he was remembering, and asked if it was alright to send it on to IBM legal. Epstein First Decl. Ex. DDD. McGauvran responded that it was fine to send it. *Id.*

On March 12, 2015, Clyne forwarded the agreement to Hagen. Epstein First Decl. Ex. LL at 2. Hagen responded by noting that this was fine "as to your confidentiality commitment to APC," but he still asked for the "APC-IBM agreement for this engagement" so that Hagen could confirm the confidentiality terms between IBM and APC. *Id.* at 1. He noted that because Clyne had been engaged as a consultant for some time and APC and IBM had a longstanding relationship, then this was likely already in place, but he wanted to make sure given the "highly confidential and sensitive nature of this particular engagement." *Id.* Clyne responded that he would follow up with APC. *Id.*

On March 17, 2015, Clyne forwarded Hagen an email containing substantive information on the current IBM/BMC contract issues and adding a post-script to tell Hagen that Clyne had not yet heard back from APC regarding additional documents to support the NDA. Epstein First Decl. Ex. MM at 1. Clyne believed that what he had, which contained specifics regarding restrictions handling "APC's client's (IBM) materials" and other confidential data in the engagement, was sufficient to "cover all necessary bases required[.]" *Id.* He asked Hagen if it would be easier to sign a "vintage, off the shelf, all encompassing IBM NDA" and satisfy the

requirement that way.  *Id.*

The next day, March 18, 2015, Hagen wrote Clyne, stating there should be no need to sign anything new.  Epstein First Decl. Ex. EEE.  Hagen stated that he did not want to "disrupt your status as a contractor by having you start signing docs" with IBM directly.  *Id.*  Thus, he asked Clyne to "circle back" to APC.  *Id.*  He thought it would be easy for APC to send over its signed NDA with IBM so "we can close the loop."  *Id.*  Clyne responded that he thought IBM's American Express office took care of it last year and that he would check with them and get back to Hagen.  *Id.*

On April 21, 2015, Stafford emailed Clyne to follow-up about obtaining the APC-IBM NDA for "this engagement."  Stewart First Decl. Ex. 54 at 4.  Clyne wrote back to Stafford, with a cc to Gargano, and stated:  "At this point, it's very possible that this particular engagement will not go through my 'pass through' vendor, APC.  I think it's just simpler, as I suggested to Thom [Hagen], that I just execute a new NDA directly with IBM."  *Id.*  He then asked Gargano if Gargano could provide one.  *Id.*

Gargano responded with an email asking Clyne why he believed "that's the case?"  *Id.* at 3.  Gargano then wrote: "As I'm sure you are aware, we need to engage your services through IBM procurement."  *Id.*  Clyne then wrote back to Gargano with a cc to Stafford:

> I will contact APC once again, since they are my vendor/employer of record as I speak, and have them call you directly regarding the NDA I signed with them in February 2014, which is supposed to have covered all confidentiality requirements re: IBM IP required protections while I worked for IBM.  (If, in the future, that situation should change re: APC, I'll alert you immediately to the change and the need to sign a new NDA.).  Since APC is unaware of this possibility, I would appreciate it if you limit your conversation with them to satisfying IBM's immediate requirements regarding the current NDA of record that APC had me sign specifically for IBM and why it was not sufficient to meet IBM's

requirements, despite APC being an IBM procurement approved supplier for IBM, and presumably well versed on required NDA's for their "on boarding process."

*Id.* at 2. Clyne asked Gargano to let him know if any issues remained after Gargano talked to APC. *Id.* Gargano responded by noting that IBM had Clyne's NDA with APC which Hagen reviewed and they did not need another one. *Id.* However, he wanted to see APC's agreement with IBM which he assumed Clyne would not have. *Id.* He asked Clyne who in IBM engaged his services so "we," referring to IBM, could "chase this down via IBM procurement?" *Id.* Clyne responded with the name "Lisa M. Fawcett" and included her IBM email address. *Id.* at 1. He stated that she was the one responsible for ensuring that all "on boarding documents necessary to work for IBM were provided by APC." *Id.*

Although Gargano had communicated with Clyne regarding the NDA, he and Clyne did not discuss Clyne's compensation. Stewart First Decl. Ex. G ("Gargano Dep.") 24:24-25:14. Gargano was unaware of any issues pertaining to Clyne's compensation until October 2015. *Id.* at 25:22-26:11. Gargano did not know if a new "scope of work" was provided to Clyne for the BMC Negotiations, even though commonly, an individual in IBM Procurement or the employee who actually requested services would prepare such a scope or statement of work. *Id.* at 154:21-156:17. He never asked APC to prepare a statement of work for Clyne's BMC Negotiations work. *Id.* at 156:18-21. He never asked someone else to ask APC to prepare such a statement of work. *Id.* at 156:22-25.

On April 20, 2015, the day before this April 21, 2015 email exchange started by Stafford and continuing between Gargano and Clyne, Clyne had emailed Calo with the subject line of "BMC IBM Attorney-Client Privileged," (hereinafter "the April 20, 2015 email"). Stewart First

Decl. Ex. 121.  This email was cc'd to Patterson.  *Id.* at 1.  Clyne wrote:

> We should probably have a 30 minute call either Wednesday late afternoon or Thursday, your time, to checkpoint on a few things, as your schedule permits.
>
> While I assume that Joe [Dzaluk] has kept you up-to-date re: goings on with BMC, it is safe to say that the "rubber's going to hit the road" in the next 5-6 weeks (re: resumed negotiations - see below) as to whether or not an "amicable" resolution with BMC can be reached to end all their claims while significantly improving on the onerous terms of IBM contained in the current OA re: our business going forward. [the "see below" refers to the forward of an email sent to Dzaluk, Stafford, and Gargano appearing below the text to Calo]; [remainder of paragraph deleted because refers only to substance of negotiations not relevant to the summary judgment motions].
>
> Also, in my initial email to, and subsequent discussion with, Rich [Patterson], I committed to a "zero risk" compensation arrangement for IBM if I should be tasked beyond the [American Express] account.  We talked about a "bounty" or "success fee" payment approach, which I embraced totally (and was moving to anyway).  I was to get back to Rich with some possibilities, but I have been totally consumed with this project since I engaged - and, not until now have I given consideration to what hopefully would be viewed by IBM as a very attractive rate/no risk payment arrangement.
>
> [paragraph deleted because concerns information about what others charge and customary industry fees].
>
> Having said all that, as you know, BMC's $ demands for all issues, pending renewals and purchases, based on the current MLA pricing and their non-compliance contentions, is beyond profound.  By the end of this week, IBM will need to set the total maximum payment(s), plus any conditions, terms and other modifications it seeks (i.e. the minimum acceptable settlement parameters) for me to negotiate, resuming next week.  What I propose is the following:
>
> If at least the minimum combination of acceptable aggregate payments, compliance fees, terms, conditions and other modifications to the existing contract is achieved, then my "success fee" is 1.20% of the difference (i.e. reduction) from BMC's total price demand for all issues, in aggregate and the final total price negotiated - again, as long as it is at or below the target established as acceptable by IBM management.  There would be no other fees (e.g. travel) involved.  Regardless of the reduction amount achieved, this would ensure more than an 80 to 1 return on my cost vs. the actual $ reductions realized.  Payment terms helpful to IBM can be discussed as well.

If, on the other hand, the targeted payment limits, terms, conditions, other modifications are not achieved, then there is no fee whatsoever.  (Not for the over 300 hours already worked, not for the travel already completed (and to be taken each week) or any other expenses going forward. $0. charge.  (Obviously I haven't invoiced anything).

The only stipulation, as with all negotiations, is that we identify which among the various objectives are "must haves" and which are viewed as "nice to haves".  Also, where appropriate, I assume there will be a few acceptable "must have" alternatives.  Success = achieving all "must haves."

When we talk, you can let me know your thoughts, or an email beforehand would be welcome.  We should close on something before next week. A verbal agreement is fine with me for now (Rich said he'd trust you with his bank account - :-) ... that's all I need, then.  (re: verbal).

If you could have your [administrative assistant] send me an invite for a time that works for you, I'd appreciate it.

*Id.* at 1-2.

Calo believes she received the email the next day, April 21, 2015, in New York.  Calo Dep./Stewart First Decl. 89:4-13.  She does not recall being surprised by the email or having any reaction to the email.  *Id.* at 89:15-22.  She admits she may have skimmed it rather than studied it.  *Id.* at 90:8.  Patterson testified he did not read the email.  Patterson Dep./Stewart First Decl. 73:13-25; 78:4-5.

Calo and Clyne then spoke on April 27, 2015.  Calo Dep./Epstein First Decl. 119:19-23.  At one point in her deposition, Calo said she did not remember anything she said in this conversation.  Calo Dep./Stewart First Decl. 83:16-24.  Calo characterizes the April 27, 2015 phone call as "a discussion" with no agreement made.  Calo Dep./Epstein First Decl. 127:16-17.  She explained in deposition that any alternative method of payment would have needed documentation and review through the vendor, as well as by IBM Procurement, legal, and

finance. *Id.* at 127:20-23. She admits that at some point before this email there was a proposal that there would be a fee, but there were no specific discussions about the logistics of how that would work or any terms or conditions that were reviewed in detail. *Id.* at 78:8-12. She confirmed at deposition that "[a]t no time [were] detailed terms and conditions brought to me in writing or in a detailed conversation that would trigger a process to engage procurement, legal and finance." *Id.* at 83:6-10. When asked if she usually expects to be bound to a "verbal agreement," she responded that when she represents IBM, "there are no verbal agreements." *Id.* at 115:17-21. "There are contracts and a detailed process for any agreement of exchange of services and funds." *Id.* at 115:21-23.

Calo never told Clyne that there was a need to go through IBM Procurement, then legal and finance, if he was going to be engaged under some new arrangement. Calo Dep./Stewart First Decl. 84:22-85:15. She thought that if he were looking for a different term or condition, he had the responsibility to "work[] that through procurement." *Id.* at 85:22-86:8. She did not know if he had ever dealt directly with IBM Procurement pertaining to the terms and conditions of his employment while working as a consultant for IBM. *Id.* at 86:9-16. Calo remembers no follow-up to the conversation. *Id.* at 83:25-84:3.

Clyne has a better memory of the phone call. Clyne testified that he and Calo spent fifteen minutes of the thirty-minute phone call talking about the contingency fee agreement. Calo Dep./Stewart First Decl. 268:13-17. They did not discuss the details of the "must haves," "nice to haves" or "must have alternatives." *Id.* at 266:25-267:11. Clyne testified that he and Calo discussed two items that were not in the April 20, 2015 email. *Id.* at 69:12-15. One was if the BMC Negotiations were concluded by June 30, 2015 without Clyne having to "work ridiculous

hours" such as 100 hours per week, he would consider lowering the percentage. *Id.* at 70:2-7; *see also id.* at 70:8-13 (stating it another way of if the agreement with BMC was reached by June 30 without any real problems, the maximum Clyne would charge, "since Ms. Calo had agreed to the 1.2 percent," would be 1.2%). The second item discussed was the "flip side of that[,]" meaning if negotiations required much more work than anticipated with unanticipated complexity, then the minimum percentage would be 1.2%. *Id.* at 70:14-20. Clyne described Calo as being "fine with that." *Id.* at 70:20.

Without his notes of the conversation, Clyne was able to explain in deposition that he believed Calo was "fine with that" because they discussed these possibilities and she recognized how "low that contingency fee was in either scenario and she - - and she readily accepted it." *Id.* at 70:24-25, 71:7-9. He recalled that towards the end of the conversation, he was struck by how focused she was on the notion that IBM would not have to pay anything if no agreement was reached with BMC. *Id.* at 71:15-18. He also recalled that she was "particularly focused" on not having to pay for any travel. *Id.* at 71:19-20.

Clyne recalled asking Calo if "we were good to go on this?" and also telling her that he "heard her," that he was trying to "make it as absolutely appealing as I can," and asking if it was acceptable to her. *Id.* at 72:6-19. Clyne testified that as they were talking, Calo repeatedly said "okay" throughout the call, creating the impression for Clyne that she was agreeing to the items as they went through them and accepting what was being proposed. *Id.* at 79:5-14. Clyne told Calo that he believed there was only a ten-percent chance he was going to be able to get all of the issues between IBM and BMC resolved. *Id.* at 74:23-75:5. Later in his deposition he explained that at the time, he believed with ninety-five percent certainty he could negotiate the "must

haves" favorably to IBM, but nonetheless, there was only a ten-percent chance an agreement would be signed because of Peter Lynt who "owned" the deal for IBM. *Id.* at 91:15-92:6. At the end of the conversation, according to Clyne, Calo told him she accepted his proposal. *Id.* at 75:13-20.

It is unclear if IBM and BMC reached an agreement before June 30, 2015. *Compare* Clyne Dep./Stewart First Decl. 291:12-13 ("the agreement was reached prior to June 30th"); *with* Clyne Dep./Epstein First. Decl. 272:3-273:12 (stating that there was an agreement on May 29, 2015 but then IBM's "Bill Bailey and Ellen Pace blew up the agreement" and indicating negotiations took seven months, meaning until September, to complete). But, even if an agreement was reached in some form earlier, it was not signed until September 30, 2015. Stafford Dep./Stewart First Decl. 90:16-17.

On July 10, 2015, Clyne emailed Calo expressing frustration with the progress of the negotiations. Stewart First Decl. Ex. 187 at 1-2. In this email, Clyne also referred to a contingency fee, writing: "On a personal note, I really have no idea how I'm going to get paid a contingency fee earned, with the sentiments that I have heard expressed on calls during the last few weeks[.]" *Id.* at 2. In deposition, Calo was unable to recall if Clyne ever complained to her with concerns about whether he was going to get paid his contingency fee. Calo Dep./Stewart First Decl. 129:6-9. She did not recall discussing Clyne's concern as expressed in the July 10, 2015 email. *Id.* at 133:17-25. She testified she did not know what Clyne was referring to when he wondered how he was going to get paid "a contingency fee" and does not recall thinking about it. *Id.* at 134:2-12. She further testified that at the time, she did not understand Clyne to be referring to anything that "we had come to a conclusion on" as opposed to a proposed idea or

method. *Id.* at 134:22-135:6. When asked specifically if she thought that this statement referred to a contingency as a proposed idea, she testified that she did not "recall specifically in July what I thought." *Id.* at 135:7-10.

Calo could not remember if she followed up on this statement in the July 10, 2015 email with a response of "what contingency," or "no contingency," or "you're an hourly fee consultant." *Id.* at 135:25-136:9. She sent Clyne a responsive email two days later that simply said: "I am studying all you sent" followed by a "smiley face" and then "lets [sic] talk Monday." Stewart First Decl. Ex. 187. At deposition, she could not remember why she put a smiley face in her response. Calo Dep./Stewart First Decl. at 136:20-21. In discussing the following Monday's phone call during her deposition, Calo testified that she could not recall what was said about the contingency fee. *Id.* at 137:10-14. She could not recall if she said something to Clyne such as "I got this email . . . and you are referring to a contingency fee that we don't have" or "your email says contingency fee and you're an hourly vendor." *Id.* at 137:15-23. She could not recall why she did not correct Clyne about the contingency arrangement after receiving the July 10, 2015 email. *Id.* at 137:14-138:4.

VIII. Post-September 30, 2015 Events

    A. First Week of October 2015

The BMC Negotiations culminated with a new agreement, referred to as the 2015 OA, which was executed on September 30, 2015. Stafford Dep./Stewart First Decl. 90:16-17. On October 1, 2015, the day after the 2015 OA was signed, Calo emailed Clyne asking him to help her "articulate the value of what we got." Stewart First Decl. Ex. 124 at 2. She noted that "now that it is signed [I] have heard on a number of fronts this is much better then [sic] prior

agreement etc. . . . so I want to make sure we are clear on that in communications going forward." *Id.* (ellipsis in original). In deposition, Calo explained her request as generated by the need to update executives on the final results and then to "communicate to the field the Global agreement and how they would benefit from it." Calo Dep./Epstein First Decl. 148:8-14. Clyne was "in position to document the results of the team's work." *Id.* at 148:20-21.

In response, Clyne offered to prepare a "high level summary" in the next few days. Stewart First Decl. Ex. 124 at 1. Then, he said, starting the following week, he was planning on putting together the detailed summary of the negotiated "total wins, vis-a-vis BMC's Best and Final submitted to Joe [Dzaluk] and his team in February and just before I engaged to negotiate the agreement." *Id.* Clyne estimated this would take a "good three weeks to complete[.]" *Id.*

He then wrote this:

This summary and comparison will be needed in order for me to get paid the contingency fee that is due (acknowledge that we left open agreement on the actual final percentage for the contingency fee[)], (although what I offered was small fraction of that charged by industry (professional negotiating) standards for such negotiations[)]. So we'll need to close on it (%) after you receive the completed package from me to review.

*Id.* He closed the email with a question of how soon Calo needed a high level summary showing everything that was gained in the 2015 OA. *Id.*

In response, still on October 1, 2015, Calo told Clyne in an email that she wanted an "exec summary - something for the package/education on what we agreed to etc and the value . . . I know we are talking tomorrow can you give me a ball park on what I can expect :-)." Stewart First Decl. Ex. 188 at 1. Clyne sought clarification on the "ball park on what you can expect" statement by Calo, wondering if she was referring to the timeline to produce the executive

summary, the estimated total value of the agreement to IBM, or something else. *Id.*

In her deposition, Calo said her use of "we" in the phrase "for the package/education on what we agreed to," meant IBM and BMC, not herself and Clyne. Calo Dep./Stewart First Decl. 155:10-13. And, she testified that the use of the "ballpark on what I can expect" phrase referred to the package and agreement between IBM and BMC, not the contingency fee. *Id.* at 156:3-14. She agreed in deposition that she had the opportunity in her response email to tell Clyne that there was no contingency and that he was an hourly vendor. *Id.* at 156:22-157:8.

On October 2, 2015 Clyne forwarded Calo the April 20, 2015 email in anticipation of a phone call shortly thereafter. Stewart First Decl. Ex. 189 at 1-2 (email noting the call was in fifteen minutes). He referred to the "attached" as only for her "pocket" reference. *Id.* at 1. He stated that

> given the environment at IBM, it will definitely be best, all around, given the final determined contingency fee based on the attached [parenthetical discussion regarding unanticipated level of complexity omitted] but a percent I will still honor nevertheless, that I complete all supporting documentation for the fee first. To talk about the actual fee due, before having the entire picture in front of you (and for others to follow in order to get it paid) will not be the best approach based on my observations over the last seven months. Kindly let me put all supporting documentation together, and overnight it to you only . . . and then we can close on the final payment to be made.

*Id.* at 1.

According to Clyne, during the call which followed this email, Calo told him she knew he did not want to "give [her] - - but she said, I need to know what I'm dealing with here, give me your best guess." Clyne Dep./Epstein First Decl. 296:10-12. Clyne responded by stating that he was reluctant to give the information at that point, but he believed he was owed a contingency fee of at least $10 million. *Id.* at 296:13-15; *see also* Epstein First Decl. Ex GGG 11 (Pl. Interrog.

Resp. No. 6); Calo Dep./Stewart First Decl. 165:7-13. Calo testified she was surprised and shocked at the dollar amount. Calo Dep./Stewart First Decl. 165:23-24; Calo Dep./Epstein First Decl. 143:8 ("I responded in shock").

According to Clyne, after he told Calo the $10 million figure, he began listing items and after he got past the first, Calo said "I got it, I got it." Clyne Dep./Epstein First Decl. 296:15-17. As Clyne puts it, Calo told him she did not have the money to pay him. *Id.* at 296:18-19. Clyne asked her if she needed "to go to the business" to which she responded that Patterson had just had a $4 million project canceled and if "they haven't taken the money away from him yet, maybe that's $4 million." *Id.* at 296:20-24. Calo said something about there being no money or "nothing documented to $10 million." Calo Dep./Stewart First Decl. 167:3-7. Calo recalled telling Clyne that there was "no budget for anything" or something similar like "there was no agreement," but she testified that in her opinion, "for sure there was no budget, nothing set aside, which you would do if you had an agreement." *Id.* at 143:9-14. She could not remember specifics about whether she told Clyne she was going to talk to someone else, maybe Patterson, about money being available in another person's budget. *Id.* at 167:10-14; *see also id.* at 167:15-168:2 (she could not recall if she said something creating the impression that she needed to talk to someone else to see if there was money in another budget).

At another point in her deposition, Calo was asked about her memory of what she and Clyne discussed after September 30, 2015. *Id.* at 140:12-14. She responded by stating that "[a]t some point, I asked Mr. Clyne what his expectation was related to the contingency fee." *Id.* at 140:16-18. "To better understand what he was proposing," she asked for an "estimated dollar amount he had in mind[.]" *Id.* at 140:20-24. She was "quite surprised" when he quoted her a

number in the millions. *Id.* at 140:22-24. She believed that Clyne brought up the contingency fee and in response, she asked him about the amount. *Id.* at 141:9019. She did not tell him that he was an hourly contractor and cannot recall why she did not tell him that. *Id.* at 142:10-20.

Calo states that Clyne's October 2, 2015 email was an "eye opener" as to Clyne's belief that there was a detailed agreement in place. Calo Dep./Epstein First Decl. 159:23-160:3. In her opinion, they had "not closed on it." *Id.* at 160:3. They had "[n]ot closed on the percentage, not closed on the starting and ending agreements, not closed on the must haves." *Id.* at 160:3-6. Hearing the $10 million figure, she realized there was a "huge disconnect." *Id.* at 167:7-9.

B. Involvement of IBM Procurement and Legal

At some point, Calo "engaged procurement and legal" to determine what Clyne was entitled to be paid for his services. *Id.* at 170:2-7. She sought purchase order details from IBM Procurement and learned that Clyne's last invoice for hourly services was dated May 2015. Calo Dep./Stewart First Decl. 182:22-184:15. On October 8, 2015, Calo forwarded Clyne's October 2, 2015 to Gargano, in IBM's legal department. *Id.* at 169:5-11. After that date, all communications between Calo and Clyne were vetted through IBM's legal department. *Id.* at 196:15-19.

On October 9, 2015, Clyne emailed Calo and stated that the previous $10 million figure was correct and that regardless of the actual negotiation results and the corresponding payment due, he would cap his fee at that number. Epstein First Decl. Ex. TT at 1. On October 15, 2015, Calo emailed Clyne asking him to submit to APC "an accounting" of the hours worked and expenses and travel related to the "BMC matter" by October 23, 2015. Epstein First Decl. Ex. VV at 4. Calo explained that APC needed the information so they could invoice IBM under the

purchase order that IBM had open with APC for Clyne's services. *Id.* She told him to work with Bengough at IBM Procurement if he had questions. *Id.*

Clyne responded within hours stating that he did not understand her email. *Id.* at 3. He wrote that the hours he worked on the BMC Negotiations had nothing to do with the APC purchase order which was issued for negotiating services at IBM for the American Express account. *Id.* Compensation for the BMC Negotiations was to be "entirely on a continency basis." *Id.* Hours and travel were to be absorbed by Clyne as part of the arrangement. *Id.* He expressed extreme concern as to why her email was sent. *Id.*

In response to this, Calo wrote that "[w]e never reached an agreement on a contingency approach." *Id.* at 3. She continued:

> The only agreement we have for your services is as a contractor through your relationship with APC. You seemed to have agreed with this as you were using your APC NDA throughout the BMC negotiations. Also your use of IBM facilities and systems, etc. was provided under the APC agreement. I also had the team take a look at your NDA with APC and it contains provisions that prevent you from engaging in a relationship with us other than through them.

*Id.* She then repeated her request that he submit his hours and expenses to APC for invoicing to IBM. *Id.* She requested that he direct further communications on billings for the BMC Negotiations to Bengough in IBM Procurement. *Id.*

Clyne never submitted any hours to APC. Instead, on December 30, 2015, he emailed Ginni Rometty, IBM's CEO, with exhibits attached, seeking a contingent payment of $13,388,402. Epstein First Decl. Ex. YY & at 25. The matter was passed off to Bill Barnett, a vice president in IBM's GTS Division who agreed to review the issue and eventually told Clyne that IBM's position was unchanged and that he should submit his hours to APC, his "employer"

so that APC could invoice IBM and Clyne could get paid.  Epstein First Decl. Exs. ZZ, AAA

(rejecting a $7 million proposal made by Clyne at some point to Barnett).

This lawsuit followed.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting

former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial."  *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th

Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial.  *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material.  *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the

light most favorable to the nonmoving party.  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d

1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material

issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

I separately address the motions as to each claim and the affirmative defenses, with one exception. Because Defendant's motion against the quantum meruit claim and Plaintiff's motion against Defendant's express contract affirmative defense are intertwined, I discuss those together.

I. Breach of Express Contract

Defendant's motion raises contract formation issues and whether Clyne and Calo agreed on enough essential terms to form a binding contingency fee agreement based on the April 20, 2015 email and relevant conduct thereafter. Defendant argues that Clyne's April 20, 2015 email lacked specific enough essential terms to form an enforceable contract. Defendant further argues that because Clyne knew his work for Defendant had to be through a third party and had to go through IBM Procurement, his discussions with Calo were at best only preliminary negotiations which gave him at most only an agreement to further agree without the mutual assent necessary to form a contract.

Plaintiff argues there are issues of fact regarding Clyne's and Calo's intent, that they agreed on essential terms, and the fact that some items needed further clarification does not defeat their April 2015 intent to reach an agreement. Plaintiff further argues that Calo's acceptance of Clyne's proposal evidences her manifestation of intent to form a contract, and that Calo's acceptance was not a preliminary negotiation requiring later approval by IBM Procurement.

A.  Contract Formation Standards

A party claiming breach of contract has the burden of establishing the contract's existence.  *Tinn v. EMM Labs, Inc.*, No. 07-963-AC, 2009 WL 507096, at *6 (D. Or. Feb. 27, 2009) (citing *Holdner v. Holdner*, 176 Or. App. 111, 120, 29 P.3d 1199, 1203 (2001)).  When the facts are not in dispute, the determination of whether a contract exists is a question of law.  *Id.* (citing *Key West Retaining Sys., Inc. v. Holm II, Inc.*, 185 Or. App. 182, 188, 59 P.3d 1280, 1283 (2002)); *see also Roeder v. Pacificorp Fin. Servs., Inc.*, No. CV-05-1578-ST, 2006 WL 3085619, at *14 (D. Or. Oct. 27, 2006) ("Oregon contract formation is a question of law") (citing *Key West*, 185 Or. App. at 188, 59 P.3d at 1283).

Oregon subscribes to the objective theory of contracts.  *Kabil Devs. Corp. v. Mignot*, 279 Or. 151, 155–57, 566 P.2d 505, 507-8 (1977) ("objective" theory of contracts operates in Oregon); *Wieck v. Hostetter*, 274 Or. App. 457, 471, 362 P.3d 254, 262 (2015) ("In assessing whether a contract was formed, Oregon applies an objective theory of contracts.").  Under this approach, in "determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts."  *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578, 120 P.3d 6, 11 (2005), *modified on reconsideration*, 203 Or. App. 768, 126 P.3d 1254 (2006); *see also Wooton v. Viking Distr. Co., Inc.*, 136 Or. App. 56, 59, 899 P.2d 1219, 1222 (1995) ("we examine the parties' objective manifestations of intent, measured by whether a reasonable person would construe a promise from the words and acts of the other.").  Formation of a contract requires "'a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'" *Id.* (quoting Restatement (Second) of Contracts § 17(1) (1981)).  "'The manifestation of mutual

assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.'" *Id.* (quoting *id.* at § 22(1)).

In the objective theory, the manifestation of acceptance made to an offeror results in a contract, regardless of the intent of the party that manifests acceptance. *The Erection Co. v. W&W Steel, LLC*, No. CV 11-805-JE, 2011 WL 5008325, at *8 (D. Or. Oct. 20, 2011) (citing *Ken Hood Constr.*, 201 Or. App. at 578, 120 P.3d at 12), *aff'd,* 513 F. App'x 664 (9th Cir. 2013). Contract law is "not concerned with the parties' undisclosed intents and ideas"; instead, only the parties' "communications and overt acts" are relevant. *Kitzke v. Turnidge*, 209 Or. 563, 573, 307 P.2d 522, 527 (1957); *see also DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford*, 868 F. Supp. 2d 1042, 1053 (D. Or. 2011) ("whether the parties entered into a contract does not depend on their uncommunicated subjective understanding; rather it depends on whether the parties manifest assent to the same express terms") (internal quotation marks omitted).

Mutual assent can be inferred from the parties' conduct. *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 153, 26 P.3d 785, 795 (2001) (law requires evidence of "mutual assent" whether "expressed through an offer and acceptance" or "manifested by conduct"); *see also The Erection Co.*, 2008 WL 5008325, at *8 ("'Mutual assent may be inferred from the conduct of the parties'") (quoting *Ken Hood Constr.*, 201 Or. App. at 579, 120 P.3d at 12). Whether a particular statement or act is a manifestation of assent is a question of fact. *Bennett*, 332 Or. at 148, 26 P.3d at 792.

In addition, for "an agreement to constitute an enforceable contract, the parties must agree on the terms of the agreement." *Tinn*, 2009 WL 507096, at *6. The parties need not agree on all

terms, but there must be agreement on those that are essential to the agreement. *Id.* (citing *Hand v. Starr-Wood Cardiac Group of Corvallis*, No. 99-1091-JO, 2001 U.S. Dist. LEXIS, at *7 (D. Or. Feb. 15, 2001) (citing *Pacificorp v. Laekview Power Co.*, 131 O.r App. 301, 307, 884 P.2d 897, 901 (1994)). "'A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement.'" *Id.* (quoting *Johnstone v. Zimmer*, 191 Or. App. 26, 34, 81 P.3d 92, 97 (2003)).

B. Contract Formation Discussion

When viewing the record in a light most favorable to Plaintiff, the non-moving party, the evidence shows that the parties made an agreement based on Clyne's proposal in the April 20, 2015 email which, according to Clyne, Calo accepted in the April 27, 2015 follow-up conversation. Although Clyne had been working on the BMC Negotiations for several weeks at this point, when the evidence is construed in his favor it is possible for a reasonable juror to conclude that Clyne's work on the BMC Negotiations was not under the APC contracts because those contracts were limited to American Express-related work, or at least to work being assigned to Clyne by Cohen who was Defendant's software manager for its American Express service account.

The April 21, 2015 communications between Clyne and Gargano about the NDA do not unequivocally establish that Clyne's work on the BMC Negotiations was under his APC contracts. Clyne believed that he had an independent or stand-alone NDA with APC governing the protection of confidential information for any APC Client and thus, governing the protection of confidential information provided by IBM for the BMC Negotiations. Epstein First Decl. Ex. N (January 2014 Confidentiality/Non-Compete Agreement regarding any APC Client which is

not specific to IBM or to a particular IBM assignment); Stewart First Decl. Ex. 54 at 2 (Gargano April 21, 2015 email to Clyne stating that IBM had Clyne's NDA with APC and they did not need another one). The issue then became what protections were in an agreement between IBM and APC. Gargano told Clyne that he did not believe Clyne would have a copy of that document. Stewart First Decl. Ex. 54 a 2. He also asked Clyne who in IBM Procurement had initially engaged his services and indicated that *IBM* would "chase this down." *Id.* With that, a reasonable juror could conclude that the ball was in IBM's court to obtain a copy of whatever Gargano was looking for. From Clyne's perspective, there was nothing more for him to do. This is especially true given how Clyne was hired in 2014 for the American Express work. When Clyne was brought on by Cohen in 2014, Clyne provided a proposal to Cohen and from there, Clyne was presented with documents from APC which incorporated the terms of his proposal. As far as the summary judgment record shows, Clyne did not initiate the contact with IBM Procurement or initiate the APC contracts for that engagement. This is also supported by Roberts's testimony that when IBM has a specific service it wants to engage from a particular resource, IBM works out "the deal" and then contacts APC and asks APC to engage that supplier.

Gargano's statement to Clyne that IBM needed to engage Clyne's services through IBM Procurement and Clyne's statement that APC was his current "vendor/employer" of record also do not alter the conclusion that the APC contracts did not necessarily govern Clyne's work on the BMC Negotiations. First, Gargano's statement did not establish any terms of any agreement and made no reference to Clyne's current APC contracts which arguably were for American Express/Cohen-assigned projects. Simply stating that IBM needed to go through IBM Procurement does not establish the existence of a current contract governing all of Clyne's

services.  Second, given how things were handled the prior year for the work he did under

Cohen's supervision where Cohen contacted him, asked for a quote, and then formalized the

arrangement with Clyne's quoted rate, Clyne could have reasonably understood that going

through IBM Procurement was only to formalize an agreement he otherwise reached directly

with IBM.

Third, Clyne's statement that APC was his current vendor/employer also does not

establish that his work on the BMC Negotiations was under a specific APC contract.  When

Clyne's email is read in its entirety and in context, a reasonable interpretation of that email is that

Clyne was speaking solely about the NDA he previously signed.  He stated:

> I will contact APC once again, since they are my vendor/employer of record as I
> speak, and have them call you directly regarding the NDA I signed with them in
> February 2014, which is supposed to have covered all confidentiality requirements
> re: IBM IP required protections while I worked for IBM.  (If, in the future, that
> situation should change re: APC, I'll alert you immediately to the change and the
> need to sign a new NDA.).  Since APC is unaware of this possibility, I would
> appreciate it if you limit your conversation with them to satisfying IBM's
> immediate requirements regarding the current NDA of record that APC had me
> sign specifically for IBM and why it was not sufficient to meet IBM's
> requirements, despite APC being an IBM procurement approved supplier for IBM,
> and presumably well versed on required NDA's for their "on boarding process."

Stewart First Decl. Ex. 54 at 2.

Defendant makes much of the parenthetical comment about the situation changing at

APC.  But, when understood in a light most favorable to Plaintiff, this email concerns only the

NDA Clyne signed with APC, his expressed frustration that the NDA he signed specifically for

IBM was not a stand-alone document that should meet IBM's needs, and his obvious desire to

have the work on the BMC Negotiations be performed outside of his current APC contract.

Clyne's parenthetical comment is ambiguous as to whether he meant a change in his

employer/vendor relationship with APC or a change as to whether the January 2014

Confidentiality/Non-Compete Agreement applied to all the work he did for IBM.

Moreover, Clyne may have worked at IBM for a long time but there is no evidence that he

was familiar with contractor-hiring procedures or had any experience with IBM Procurement

during his employment. When viewing the evidence in Plaintiff's favor, while it seems clear that

Clyne was trying to keep APC from learning about his contingency agreement for the BMC

Negotiations, the evidence nonetheless suggests that Clyne could have assumed that the process

was to work out an agreement with an IBM GTS employee (Cohen, then Calo), at which point

the logistics of getting that agreement through IBM Procurement were a formality and were

IBM's responsibility.

Additionally, Plaintiff explains, Clyne's statements were true. APC remained unaware of

the "possibility" of work on the BMC Negotiations until after the September 30, 2015 execution

of the 2015 OA. Because Clyne continued to work through the APC contracts on the American

Express projects, nothing in regard to Clyne's relationship with APC changed. Additionally,

Plaintiff explains that Clyne's comment that APC was his "vendor/employer as we speak" was a

true statement and not inconsistent with his position that his APC contracts did not cover the

work on the BMC Negotiations because when Clyne wrote that statement, he was in fact still

working for IBM on its American Express account through the APC contracts and did so until

May 2015.

Clyne's April 20, 2015 email is a written offer as clearly demonstrated by his use of the

words "I propose," which were preceded by his discussion of a "zero risk compensation

arrangement" or a "success fee payment approach" for his work. Stewart First Decl. Ex. 121 at 1.

This was followed by suggested terms, including: (1) achievement of a "minimum combination of acceptable aggregate payments, compliance fees, terms, conditions and other modifications to the existing [BMC] contract"; (2) no other fees, such as travel, or expenses to be paid to Clyne; (3) no fee if targeted "payment limits, terms, conditions, other modifications" are not achieved; (4) defining success as achieving all "must haves"; (5) a "stipulation" that "must haves," "nice to haves," and "must have alternatives" be identified; and (6) a "success fee" of "1.20% of the difference (i.e. reduction)" between "BMC's total price demand for all issues, in aggregate and the final total price negotiated" as long as it is at or below the target established by IBM management. *Id.*

Clyne's testimony, which is credited when analyzing Defendant's motion for summary judgment, establishes that Calo accepted his proposal during their April 27, 2015 telephone conversation. Calo's subjective understanding of the proposal or the conversation is not relevant to determining whether there was mutual assent because under the objective theory of contract formation, it is the manifestation of that assent by words and actions that is determinative. Calo admits she did not tell Clyne that there was no agreement or that their discussion was preliminary. She did not tell Clyne that he had to go through IBM Procurement, legal, and finance. She did not tell him he already had a contract, ask why he was not going to do the BMC Negotiation work under that contract, or tell him that IBM would not do a contingency agreement. There is no evidence that she objected to the proposal at the time.

Clyne testified that while discussing the April 20, 2015 email on the phone on April 27, 2015, Calo repeatedly said "okay" throughout the call. While this could have meant "okay I hear you" or "okay I agree and accept," both are reasonable interpretations of Calo's statements and

thus, when viewing them in Plaintiff's favor, they show that Clyne reasonably could have understood her agreeing with the proposed items. Clyne also testified that he and Calo clarified the 1.2% success fee to mean that if negotiations were concluded promptly before June 30, 2015 and without "ridiculous hours," Clyne would consider lowering his fee, but if negotiations required much more work than anticipated and with great complexity, the 1.2% would be a minimum. Clyne testified that Calo was "fine with that." Finally, Clyne testified that at the end of the conversation Calo told him she accepted his proposal.

The proposal as accepted contained terms of (1) the work to be performed because it was obvious the April 20, 2015 email and the April 27, 2015 phone call addressed Clyne's work on the BMC Negotiations; (2) compensation terms of no charge for expenses and the payment of a 1.2% commission; and (3) some indication of how a commission was to be earned by stating that success was achieving "must haves" and delineating that this meant the "minimum combination of acceptable aggregate payments, compliance fees, terms, conditions and other modifications to the existing [BMC] contract" for IBM. The evidence supports a conclusion that the parties manifested assent to these terms and thus, initially formed an agreement.

C. Indefinite Terms

Even if an oral agreement is otherwise established by mutual assent, the terms may still be sufficiently uncertain as to prevent enforcement. *Brazil v. FedEx Ground Pkg. Sys., Inc.*, No. Civ. 03-6287-TC, 2004 WL 2457776, at *3 (D. Or. Nov. 1, 2004); *see also Padilla v. RRA, Inc.*, 124 N.M. 111, 114, 946 P.2d 1122, 1125 (1997) (indefiniteness can defeat a contract claim in two ways: (a) by indicating the parties failed to reach an agreement, or (b) by preventing enforcement because the terms are not reasonably certain).

42 - OPINION & ORDER

"'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Padilla*, 124 N.M. at 114, 946 P.2d at 1125 (quoting Restatement (Second) of Contracts § 33(2)); *see also Brazil*, 2004 WL 2457776, at *3 (an "'offer must be so certain that upon an unqualified acceptance the nature and extent of the obligations of each party are fixed and may be determined with reasonable certainty'") (quoting *Kliemek v. Perisich*, 231 Or. 71, 78-79, 371 P.2d 956, 960 (1962)). Here, concerns about enforcement of the parties' agreement are created by the variable percentage contingent fee Calo and Clyne discussed in the April 27, 2015 phone call and the lack of any precise definition of the "must haves" and other terms which Clyne needed to achieve to be considered successful and thus receive payment.

### 1. Variable Percentage Rate

The variable percentage rate does not render the agreement unenforceable. Cases support the court imposing a reasonable fee in certain circumstances. In *Padilla*, the court explained that when two parties have bargained for one of them to provide personal services to the other but have left the payment term open to later negotiations, a court may determine that the parties have reached an enforceable contract to provide the services for a "reasonable" payment. *Id.* at 115, 946 P.2d at 1126. Because the plaintiff could concede that he was entitled to the lowest possible agreed-upon rate, the *Padilla* court held that the plaintiff's testimony, if believed, could sustain a verdict that the defendants breached an enforceable contract to pay the plaintiff a one-percent commission. *Id.* at 116, 946 P.2d at 1127.

In a case from Maine, the defendant argued that a purported oral contract with the plaintiff was too indefinite to determine the rights of the parties because it failed to set the

amount of a commission. *Fitzgerald v. Hutchins*, No. PEN-09-139, 2009 ME 115, ¶ 17, 983 A.2d 382, 388 (Me. Dec. 3, 2009). The court rejected the argument, noting that if a contract "leaves open a key term, the law invokes the standard of reasonableness, and courts will supply the needed term." *Id.* (internal quotation marks omitted). There, the "lack of a stated percentage for commission" did not render the contract unenforceable because the plaintiff had a history of selling power plants for the defendant's company and the law allowed indefiniteness to be "'given precision by usage of trade or course of dealing between the parties.'" *Id.* (quoting Restatement (Second) of Contracts § 33 cmt. a ). As a result, summary judgment for the defendant was unwarranted. *Id.*

Here, the April 20, 2015 email set out a definite percentage of 1.2%. Although discussions on April 27, 2015 allowed for the possible variability of that percentage, the rate was clearly based on the 1.2% initially proposed. Given that the 2015 OA was not executed until September 30, 2015, indicating that the BMC Negotiations did *not* conclude before the June 30, 2015 date which would have triggered a lower percentage, a reasonable rate is a minimum of 1.2%. As for a possible increase in the rate, under *Padilla*, an enforceable contract may be found by determining that the commission rate is 1.2%, the lowest rate Calo allegedly agreed to pay should the BMC Negotiations continue past the June 30, 2015 date. With the percentage grounded in Clyne's initial 1.2% proposal, the Court can determine that 1.2% is a reasonable rate and the contract is not made unenforceable by Calo's April 27, 2015 acceptance of an agreement with a percentage rate that could have gone lower or higher than that rate.

2. BMC Total Price Demand & "Must Haves," Etc.

The other potentially indefinite terms are "must haves" and related terms which were the

basis of Clyne's compensation.  Clyne proposed that he be paid 1.2% of the difference between (1) BMC's "total price demand for all issues" and (2) the "final total price negotiated[,]" as long as the "final total price" negotiated met IBM's minimum threshold for "acceptable aggregate payments, compliance fees, terms, conditions, and other modifications" to the existing contract and included IBM's "must haves."  Stewart First Decl. Ex. 121 (the April 20, 2015 email). Defendant argues that because terms such as "BMC's total price demand" and "must haves" are not defined by the agreement, the agreement is unenforceable.  *E.g.*, *Phillips v. Johnson*, 266 Or. 544, 555, 514 P.2d 1337, 1343 (1973) (must be a "meeting of the minds" on all terms with nothing left open for future negotiation).

Clyne's compensation, assuming a definite 1.2% commission, is based on "BMC's total price demand" as well as IBM's minimum threshold and "must haves."  Plaintiff suggests that these terms, particularly the "must haves" terms, are not terms of compensation but are his own conditions.  However, when Clyne's entire email is read, it is clear that these terms provide for Clyne's compensation.  The relevant language in the April 20, 2015 email is found in the following paragraphs:

> Having said all that, as you know, BMC's $ demands for all issues, pending renewals and purchases, based on the current MLA pricing and their non-compliance contentions, is beyond profound.  By the end of this week, IBM will need to set the total maximum payment(s), plus any conditions, terms and other modifications it seeks (i.e. the minimum acceptable settlement parameters) for me to negotiate, resuming next week.  What I propose is the following:

> If at least the minimum combination of acceptable aggregate payments, compliance fees, terms, conditions and other modifications to the existing contract is achieved, then my "success fee" is 1.20% of the difference (i.e. reduction) from BMC's total price demand for all issues, in aggregate and the final total price negotiated - again, as long as it is at or below the target established as acceptable by IBM management.  There would be no other fees (e.g. travel) involved. Regardless of the reduction amount achieved, this would ensure more than an 80

to 1 return on my cost vs. the actual $ reductions realized.  Payment terms helpful to IBM can be discussed as well.

If, on the other hand, the targeted payment limits, terms, conditions, other modifications are not achieved, then there is no fee whatsoever.  (Not for the over 300 hours already worked, not for the travel already completed (and to be taken each week) or any other expenses going forward. $0. charge.  (Obviously I haven't invoiced anything).

The only stipulation, as with all negotiations, is that we identify which among the various objectives are "must haves" and which are viewed as "nice to haves".  Also, where appropriate, I assume there will be a few acceptable "must have" alternatives.  Success = achieving all "must haves."

Stewart Decl. Ex. 121.

Clyne initially refers to the need for IBM, "[b]y the end of this week[,]" to set the maximum it is willing to pay as well as the minimum terms it will need to achieve settlement. He notes that his fee will be triggered if the minimum terms in certain areas in the aggregate are achieved.  The areas, but not the minimum terms, are spelled out.  As a corollary to that, he states that if the "targeted" limits are not achieved, he receives nothing.  It is clear that the word "targeted" refers to those minimum conditions that IBM still needed to establish.  Then, he ends with the phrase that the "only stipulation" is that "we identify which among the various objectives," (which again contextually is a reference to the minimum conditions), "are 'must haves,'" nice to haves, or must have alternatives.  Success is defined as achieving all of the must haves.  Thus, this means that the parties needed to stipulate as to which of the minimum conditions were must haves, and so forth.  Clyne was to be paid only if he achieved the minimum conditions identified as must haves.

The proposal by Clyne is capable of only one reasonable construction:  he had to settle the contract and had to achieve all "must haves" before he was entitled to payment.  If the "must

haves" were "not achieved," there was "no fee whatsoever." Thus, the "must haves" were not just a basis for computing the amount of a contingency fee. Instead, obtaining the "must haves" was required for success in the first place which entitled Clyne to compensation *at all*.

These are properly understood as compensation terms. They are essential because Clyne's compensation "goes to the substance of the contract." *Romtec v. Oldcastle Precast, Inc.*, No. 08-06297-HO, 2011 WL 690633, at *4 (D. Or. Feb. 16, 2011) ("A term is material to an enforceable agreement when it goes to the substance of the contract"). Ordinarily, whether a term is material to a contract is a question of fact. *Id.* However, no reasonable juror could conclude that the basis for determining a right to compensation is anything other than an essential contract term. *Id.* ("Whether a contract term is material is a question for the fact finder unless the uncontroverted evidence leads to only one conclusion.").

The first of these compensation terms is "BMC's total price demand." Plaintiff contends that this term was contained in February submissions made to IBM by BMC. *See* Clyne Dep./Stewart First Decl. 267:14-19 (Clyne considered BMC's total price demand to be the February options that BMC had put on the table "[a]s a base[.]"); Stewart First Decl. Exs. 50-52. Also, in the April 20, 2015 email, Clyne indicates that Calo already knew what BMC's price demands were. Stewart First Decl. Ex 121 at 1 ("as you know, BMC's $ demand for all issues, pending renewals and purchases, based on the current MLA pricing and their non-compliance contentions, is beyond profound.").

In *DCIPA*, the parties disagreed about the rate to be paid by the plaintiff for certain health care services that the defendant provided to one of the plaintiff's members. 868 F. Supp. 2d at 1052. The plaintiff argued that the defendant's conduct, which included obtaining the plaintiff's

authorization form referring to "DMAP rates," established a contract for payment of DMAP rates. *Id.* The defendant argued that because it interpreted the term "DMAP rates" to refer to a separate DMAP rate in a different contract to which it was a party, no contract with the plaintiff was formed because there was no "meeting of the minds" on a key term.

Judge Aiken found that the "parties' communications and overt actions clearly manifested an objective intent that defendant would provide the relevant services and plaintiff would pay for them at 'DMAP rates.'" *Id.* at 1053. She explained that the fact that the parties "may have subjectively attributed different meanings to the term 'DMAP rates' is immaterial in regard to whether an enforceable contract was formed." *Id.* Because the parties expressed their mutual assent through conduct, an enforceable contract was formed. The fact that each had a different subjective interpretation of the term "DMAP rates" did not preclude the formation or enforcement of a contract. *Id.*

As *DCIPA* illustrates, disputes over the interpretation of a term are distinguishable from the question of whether a term is so uncertain as to preclude enforcement. Given the reference in the April 20, 2015 email to Calo's preexisting knowledge of the then-existing BMC total price demand as well as Clyne's deposition testimony that the reference was to the earlier submissions by BMC to IBM in February 2015, the reference in the April 20, 2015 email to "BMC total price demand" was not so indefinite or uncertain as to preclude enforcement. Construing the evidence in Plaintiff's favor establishes that both Clyne and Calo knew the reference and the amount at the time. While there may be subjective disagreement about what the phrase meant, it is a disagreement as to the interpretation of an agreed-upon term, just like what occurred in *DCIPA*.

As to the other compensation terms, Plaintiff agrees that Clyne did not define the "must

haves," etc. in his April 20, 2015 email. Clyne Dep./Epstein First. Decl. 265:13-266:20.  Clyne

states that he and Calo did not discuss the "must haves," etc. in their April 27, 2015 telephone

conversation.  *Id.* at 266:21-267:7.  Although he and Calo "came to an agreement," they "didn't

discuss what the criteria for achieving success under that agreement would be."  *Id.* at 267:8-11.

Plaintiff argues that the contingency agreement is enforceable because it was up to

Clyne's "bosses" at IBM to identify the "must haves," etc., *id.* at 265:13-19 (stating that it was up

to IBM to define the must haves and nice to haves), which they did during the course of

negotiations.  In support of its position that the must haves, etc. were clearly identified by IBM,

and thus, the argument goes, did not need further definition in the April 20, 2015 email, Plaintiff

cites to approximately twenty exhibits without any further explanation of what they show or

exactly what they support.  Pl. Resp. 9, ECF 79 (citing to Exs. 160-180).  Defendant notes that

each of the exhibits is dated after the April 20, 2015 email and Calo's alleged April 27, 2015

acceptance and therefore, these exhibits cannot provide a definition of the must haves, etc. at the

time any agreement was formed.  Plaintiff also cites to some of Clyne's deposition testimony

which does establish that the must haves were ever actually clearly defined.  *Id.* (citing Clyne

Dep./Stewart Second Decl. 265:4-266:20 (stating that none of the must haves or nice to haves

were defined in the April 20, 2015 email and that it was up to IBM to tell Clyne what they

were)); *Id.* (citing Clyne Dep./Stewart Second Decl. 273:24-277:24 (explaining that the must

haves, etc. were defined by some unspecified point because the parties had an agreement by May

29, 2015[5] and discussing conduct in May and July 2015)).  Plaintiff additionally cites to

deposition testimony of Gargano to support his assertion that his bosses clearly defined the must

---

[5]  In the testimony, Clyne initially says March 29 but then clarifies that it was May 29.

haves. But, his cite is to fifty-six continuous pages of Gargano's deposition testimony with no

citations to a particular page or line within that testimony or any other clarification of what is

relevant in those pages. Pl. Resp. 9 (citing to Gargano Dep. 197:21-254:23). Because it is not

the Court's burden to search through the record, *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d

1026, 1029 (9th Cir. 2001) (a district court is not required to comb the record to find some reason

to deny a motion for summary judgment); Local Rule 56-1(a) ("A party's factual positions must

be supported by citations, *by page and line as appropriate*, to the particular parts of materials in

the record") (emphasis added), this is insufficient to establish that IBM identified the must haves.

Regardless of the lack of evidentiary support, however, the point of Plaintiff's argument,

as I understand it, is that when an agreement is reached, by definition the must haves have been

identified and achieved. As a result, the fact that the April 20, 2015 email and the April 27, 2015

conversation did not result in a specific delineation of "must haves" at that time does not prevent

enforcement. That is, the resolution of the BMC Negotiations is enough to establish success and

the exact monetary value of that success is a damages issue that can resolved later as it is not at

issue in these motions.

I disagree with Plaintiff. The essential terms of the agreement must be reached at the

formation of the contract in order to have an enforceable agreement. If the compensation terms

had been for a set fee or an hourly fee, the "must haves" would be divorced from the right to

compensation and would not be an essential term. Thus, they could be defined as negotiations

progressed. But here, Clyne's offer which Calo allegedly accepted, set forth a compensation

arrangement based on success which was achieving minimum targets and "must haves." There

was no right to compensation without the must haves. Thus, Plaintiff's argument that IBM's

later-supplied "definitions" of must haves supply a basis for enforcement, is unavailing.

Finally, Clyne's argument that terms such as "must haves" did not require further definition because they "are not misunderstood in negotiations" suggests a "custom and usage" argument. Industry custom and usage may be used "to establish the meaning that the parties intended or a particular contractual term." *VTech Comm'ns, Inc. v. Robert Half, Inc.*, 190 Or. App. 81, 87-88, 77 P.3d 1154, 1158 (2003)). But, the "custom and usage evidence would have to show that the parties bargained with reference to that standard[.]" *Id.* at 88, 77 P.3d at 1158 (explaining further that this means each party had the custom and usage in mind when using the relevant term). Here, the only evidence is that Clyne believed it was up to IBM to define the "must haves." Further, the April 20, 2015 email indicating that IBM still needed to establish its minimum settlement terms and Clyne's statement that the must haves, etc. still needed to be identified, indicates, even considering the evidence in a light most favorable to Plaintiff, that the parties were not "bargaining" the must have terms with custom and usage in mind. Additionally, the summary judgment record contains no evidence whatsoever as to what industry custom and usage in this particular context would be.

Considering the evidence in a light most favorable to Plaintiff, there was mutual assent to certain terms and thus, an agreement was initially formed by Clyne's April 20, 2015 email and Calo's acceptance of his proposal in the phone call of April 27, 2015. However, the compensation terms were not sufficiently defined to be enforceable. This defeats Clyne's breach of express contract claim.[6]

II. Breach of the Implied Duty of Good Faith & Fair Dealing

---

[6] Given my conclusion, I decline to address Defendant's "agreement to agree" argument.

Plaintiff alleges that Defendant breached the covenant of good faith and fair dealing by "depriving GEM of the benefits of the parties' bargain in an amount to be proven at trial . . . ." Compl. ¶ 32. Defendant moves against this claim for two reasons. First, because the existence of a valid contract is required to support a claim for breach of the implied covenant of good faith and fair dealing, and because, according to Defendant, there is no contingency contract between the parties, this claim must be dismissed. Defendant is correct. If no contract exists, "the duty of good faith and fair dealing is not implicated." *Brazil*, 2004 WL 2457776, at *4; *Saucedo v. Bank of Am., N.A.*, No. 3:11-cv-00813-MO, 2011 WL 6014008, at *3 (D. Or. Dec. 1, 2011) ("In order to allege a claim for breach of the duty of good faith and fair dealing, there must exist a valid contract to which the duty attaches."). Because Plaintiff's breach of express contract claim fails, this claim is dismissed.

Alternatively, even assuming the existence of a valid contingency agreement, Defendant argues that this claim should be dismissed because the alleged "implied" terms and damages are duplicative of those asserted to be part of the express agreement. In that situation, the actual contract terms of the alleged contingency agreement would control, not any implied term. Defendant is correct again.

While the implied duty of good faith and fair dealing is meant to "facilitate performance and enforcement of the contract where it is consistent with and in furtherance of the agreed-upon terms of the contract or where it effectuates the reasonable contractual expectations of the parties[,]" it "cannot expand the parties' substantive duties under a contract; rather, it relates to the performance of the contract.'" *Robinson v. Charter Practices Int'l LLC*, No. 3:14-cv-1736-PK, 2015 WL 1799833, at *13–14 (D. Or. Apr. 16, 2015) (internal quotation

marks omitted); *see also Zygar v. Johnson*, 169 Or. App. 638, 645, 10 P.3d 326, 330 (2000) (a party's duty of good faith in the performance of a contract cannot contradict an express contractual term or "otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract"). As a result, "the duty of good faith and fair dealing . . . may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue[.]" *Id.* (internal quotation marks omitted).

Plaintiff argues that Defendant's challenge to Clyne's asserted right to a contingency fee after the 2015 OA was executed on September 30, 2015, sought to deprive Clyne of the benefits of the bargain after he fully performed the services required of him. However, while this may or may not be so, it does not change the nature of the claim which is based on a theory that Defendant violated the contingency fee agreement by denying Plaintiff payment under that agreement. Plaintiff fails to identify anything other than an express term of the contract that Defendant allegedly breached. Defendant's conduct is nothing more than "unpleasantly motivated" conduct opposing Plaintiff's position that he was owed a contingency fee under an express contract. Therefore, independent of the validity of the breach of express contract claim, the implied duty of good faith and fair dealing claim is dismissed.

III.  Quantum Meruit Claim

Defendant seeks summary judgment on Plaintiff's quantum meruit claim based on two arguments:  (1) that the work Clyne did was governed by express contracts between GEM, APC, and IBM; and (2) that independent of the GEM-APC-IBM contractual relationship, Plaintiff cannot establish that IBM unjustly retained a $13.3 million benefit. Plaintiff seeks summary judgment on the express contract affirmative defense because the quantum meruit claim is an

alternative to an express contract claim and there is no evidence that the parties' agreements with APC provided the exclusive basis for an agreement between GEM and IBM or that the agreements between GEM and APC controlled Clyne's work on the BMC Negotiations.

A.  Legal Standards

Quantum meruit is a "quasi-contractual obligation created by law without regard to the intention of the parties in situations in which one person is accountable to another on the grounds that otherwise he would unjustly benefit or the other would unjustly suffer loss." *U.S. ex rel. Nw. Cascade Inc. v. Colamette Constr. Co.*, No. 3:13-cv-01498-AA, 2014 WL 5092253, at *5 (D. Or. Oct. 8, 2014) (internal quotation marks omitted).  The elements of a quantum meruit claim are "a benefit conferred, awareness by the recipient that a benefit has been received, and judicial recognition that, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it[.]"  *Oracle Am., Inc. v. Or. Health Ins. Exch. Corp.*, 80 F. Supp. 3d 1168, 1176 (D. Or. 2015) (internal quotation marks omitted).

A quantum meruit claim and a breach of express contract claim are mutually exclusive. *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 563 (D. Or. 2009); *see also Ken Hood Constr.,* 203 Or. App. at 772, 126 P.3d at 1256 ("if the parties have a valid contract, any remedies for breach flow from that contract, and a party cannot recover in *quantum meruit* for matters covered by the contract.").  Nonetheless, "a plaintiff may plead alternatively on an express contract and in quantum meruit," and not be required to elect upon which theory plaintiff will rely.  *Kashmir Corp. v. Patterson*, 289 Or. 589, 592, 616 P.2d 468, 469 (1980).  As Justice Tongue explained in his concurring opinion in *Kashmir Corp.*, "when any doubt exists regarding the existence or enforceability of an express contract, or when the express contract fails to provide the basis for

payments to be made under the contract, a plaintiff may plead alternatively on an express contract and in quantum meruit without being required to elect." *Id.* at 594, 616 P.2d at 471.

B.  APC-IBM-GEM Agreements

Defendant argues that the MSA between APC and GEM and the GEM SOW governed the remuneration for Clyne's work on the BMC Negotiations and as a result, regardless of the merits of the breach of express contract claim, Plaintiff cannot prevail on the quantum meruit claim.  To succeed, Defendant must establish that no reasonable juror could conclude that Clyne could work on the BMC Negotiations independent of the APC-related contracts.

Defendant is correct that the MSA contains a non-compete provision prohibiting the Supplier (GEM) from establishing a sales relationship or from providing services to "the Client" (IBM in this instance), except through APC during the term of the MSA and for one year thereafter.  And, because the MSA was executed in late January 2014 and had a two-year term, it was still effective in 2015 when Clyne sent his April 20, 2015 email to Calo regarding a contingency agreement.  Defendant is also correct that Clyne relied on the separate January 2014 Confidentiality/Non-Compete Agreement to govern the protection of IBM's information during the BMC Negotiations.  And, Defendant is correct that before Clyne began work on the BMC Negotiations, he worked on four different projects under his APC contracts.

Because the January 2014 Confidentiality/Non-Compete Agreement was not particular to any APC client or any particular project, a reasonable juror, when viewing the evidence in a light most favorable to Plaintiff, could conclude that Clyne reasonably believed that this was a stand-alone NDA allowing him to work on the BMC Negotiations for IBM without committing to performing the work through APC.  And, when he was told that IBM needed an IBM-APC

confidentiality agreement, he was also told that IBM would locate that agreement because IBM did not believe Clyne would have a copy of it. Although the evidence can be construed to suggest that by virtue of the January 2014 Confidentiality/Non-Compete Agreement being an APC-GEM document, it should have suggested to Clyne that his work on the BMC Negotiations would be under APC's auspices, that is not the only reasonable conclusion to be drawn. Given that IBM remained an APC client and that the January 2014 Confidentiality/Non-Compete Agreement was not project specific, a reasonable person could have understood that the NDA provisions could apply to work done for IBM without APC contracts governing payment.

As to the MSA, that Plaintiff might be in violation of a non-compete agreement with APC does not mean that Clyne's belief about making an independent agreement with IBM was unreasonable. First, there is evidence that the non-compete provision is inapplicable given that IBM introduced Plaintiff to APC and not the other way around. *See* Roberts Dep./Stewart First Decl. 90-92 (APC's Roberts testified in deposition that the "Finder's Fee" penalty in the non-compete provision in the MSA would not apply because APC did not introduce GEM to IBM).

Second, even if that provision did apply, Clyne may have viewed the possibility of a thirty-percent Finder's Fee as a cost of doing business with IBM on what Clyne believed could be a very lucrative payout. His "Finder's Fee" would be either zero or thirty-percent of several million dollars. While the Finder's Fee is not insignificant, it does not by itself compel a conclusion that the APC contracts governed Clyne's work on the BMC Negotiations.

Defendant also again relies on Clyne's April 21, 2015 statement in his email to Gargano about APC being his "vendor/employer of record" and Hagen's statements that IBM did not want to disrupt Clyne's contractor status and further, that any arrangement he had with IBM needed to

go through IBM Procurement. For the reasons previously explained, these statements do not establish as a matter of law that the APC contracts governed Clyne's work on the BMC Negotiations.

Defendant argues that there is no support in the relevant documents for Plaintiff's argument that the APC contracts were limited to IBM's American Express account. But, that overlooks Clyne's testimony that his continued work for Cohen was for American Express and thus, he kept working on projects in addition to the BMC Midrange negotiations under the APC contracts. Because the BMC Negotiations he undertook at Calo's direction were not related to American Express, the argument then is whether it was reasonable for Clyne to believe he could negotiate a different contract with IBM but using the January 2014 Confidentiality/Non-Compete Agreement which he viewed as a stand alone document, independent of the MSA and GEM SOW. For all of the reasons discussed, when the evidence is viewed in Plaintiff's favor, it is possible for a reasonable juror to agree with Plaintiff.

To succeed on its motion for summary judgment against the express contract affirmative defense, Plaintiff must establish that as a matter of law, the APC contracts did *not* govern Clyne's compensation for his work on the BMC Negotiations. But, just as there are reasonable inferences supporting Plaintiff's theory, there are reasonable inferences supporting Defendant's theory. The facts regarding the relationship of the IBM-APC-GEM contracts to the BMC Negotiations are capable of competing, reasonable inferences. As a result, Plaintiff's motion is denied.

B. Unjust Benefit

As noted above, the crux of a quantum meruit claim is the injustice resulting from the defendant receiving a benefit without paying for it. Injustice may be found in one of three

circumstances: "'(1) the plaintiff had a reasonable expectation of payment; (2) the defendant should reasonably have expected to pay; or (3) society's reasonable expectations of security of person and property would be defeated by non-payment.'" *F.D.S. Marine, LLC v. Shaver Transp. Co.*, No. 00-1245-ST, 2001 WL 34045718, at *16 (D. Or. May 25, 2001) (quoting *Yanney v. Koehler*, 147 Or. App. 269, 279, 935 P.2d 1235, 1241 (1997)).

All of Defendant's arguments are based on its view of the facts. Defendant argues that the first circumstance is not established here because there is no reasonable expectation on the part of Plaintiff, Defendant, or society of a $13.3 million contingency fee. In support, Defendant cites to the same evidence it relies on to contend that Clyne knew any contract with IBM needed to go through IBM Procurement and that his non-compete with APC prohibited him from doing independent work for IBM. But, this ignores that the competing view, as previously discussed, is a reasonable conclusion based upon the facts and thus, Defendant cannot defeat this claim at summary judgment. Defendant also argues that the failure to define key terms defeats any reasonable expectation by Plaintiff that it would be paid based on a contingency method. But, this ignores that quantum meruit is an alternative to the breach of express contract claim and thus, the fact that the "must haves" may not have been sufficiently defined to enforce the agreement does not defeat a reasonable expectation that Plaintiff would be paid based on a percentage of savings achieved through Clyne's negotiation work.

Defendant also relies on the hourly rate that Plaintiff was paid under the APC contracts. In Defendant's view, that evidence conclusively establishes that the $13.3 million sought by Plaintiff is not the reasonable value of Clyne's services. Instead, the value is approximately $660,000 based on his hourly rate multiplied by the number of hours. But, when the evidence is

viewed in Plaintiff's favor, there is no dispute that the BMC Negotiations concerned a contract with millions of dollars, if not more, at stake. If the factfinder determined that the parties had indeed agreed to a contingency payment, the reasonable value of Clyne's services could be higher than the $660,000 Defendant contends is the reasonable value based on a $220 hourly rate.

Finally, Defendant argues that because it has been willing to pay the $220 hourly rate since October 2015, a jury could not conclude that IBM has retained any "unjust gains." I reject this argument because once again, when viewing the evidence in Plaintiff's favor, a jury could conclude that the reasonable value of Clyne's services is somewhere between the $660,000 offered by Defendant and the $13.3 million sought by Plaintiff.

Defendant's motion directed to the quantum meruit claim is denied.

## IV. Promissory Estoppel

In its Fourth Claim for Relief, Plaintiff alleges that Defendant represented that it would pay Plaintiff based on 1.2% of the savings and avoided costs that IBM realized from Clyne's successful efforts in resolving the dispute between IBM and BMC, and that Defendant intended that Plaintiff rely upon Defendant's representations. Compl. ¶ 39. Plaintiff also alleges it acted in reliance upon Defendant's representations to Plaintiff's economic damage in an amount of at least $13,388,402. *Id.* ¶ 40.

Promissory estoppel is not a separate cause of action, even though a party may plead it separately as Plaintiff has done here. *Kraft v. Arden*, No. CV 07-487-PK, 2008 WL 4866182, at *10 & n.4 (D. Or. Nov. 7, 2008). Instead it "'is a subset of and a theory of recovery in breach of contract actions.'" *Id.* (quoting *Neiss v. Ehlers*, 135 Or. App. 218, 227-28, 899 P.2d 700, 706 (1995)). While a theory of recovery in such claims, "[p]romissory estoppel does not apply when a

valid contract exists." *Id.*.

In Oregon, courts "use the term promissory estoppel to refer to two similar but distinct concepts." *Lash v. PNC Bank, N.A.*, No. 3:14-cv-01791-SI, 2015 WL 1319321, at *3 (D. Or. Mar.24, 2015). In the first, "'actions taken in reliance on a definite promise may serve as a substitute for consideration[.]'" *Id.* (quoting *Staley v. Taylor*, 165 Or. App. 256, 261 n.5, 994 P.2d 1220, 1223 n.5 (2000)). In the second application of the theory, "a party acts in reliance on an indefinite promise to create a binding obligation." *Id.* In this situation, only reliance damages are allowed. *Id.*

Plaintiff's Complaint does not clearly assert which concept of promissory estoppel it relies on. In its response to Defendant's motion, however, Plaintiff relies on cases supporting the second concept of promissory estoppel allowing recovery for "promises that are indefinite or incomplete[.]" *Neiss*, 135 Or. App. at 228, 229, 899 P.2d at 707 ("[t]he fact that a promise is indefinite, incomplete or even incapable of enforcement according to its own terms, does not mean that *no* redress should be possible for the damage that directly flows from the promisee's reliance on the promise"). Thus, I construe Plaintiff's claim to assert only that type of promissory estoppel.

A promise is enforceable under a promissory estoppel theory if there is "'(1) a promise; (2) which the promisor could reasonably foresee would induce conduct of the kind that occurred; (3) actual reliance on the promise; and (4) a substantial change in position by the party seeking to enforce the promise.'" *Lash*, 2015 WL 1319321, at *3 (quoting *Natkin & Co. v. H.D. Fowler Co.*, 128 Or. App. 311, 314, 876 P.2d 319, 321(1994)). In other words, "promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance[.]" *Barnes v.*

*Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th Cir.), *as amended* (Sept. 28, 2009).

Defendant argues that this claim requires dismissal because there is no evidence of reasonably foreseeable inducement, no actual reliance, and no substantial change in position. I reject Defendant's position that the promise in this case is too indefinite to support the element of reasonably foreseeable inducement. *Kraft*, 2008 WL 4866182, at *11 ("'the facts of specific cases may be such that the promise is not only too indefinite for enforcement as a contract, but is so illusory that it could not have been acted on or foreseen as an inducement to action.'") (quoting *Neiss*, 135 Or. App. at 229, 899 P.2d at 707). Although the agreement was too indefinite regarding the "must haves," etc., to support its enforcement as a contract, it still supports a promissory estoppel theory because when viewing the evidence in Plaintiff's favor, the parties agreed on the fundamental principles of a 1.2% commission payment based on a settled contract with BMC that was favorable to IBM with a measurable monetary value.

Whether Defendant could reasonably foresee that its promise would induce Plaintiff to continue performing work on the BMC Negotiations and whether Plaintiff actually relied on that promise in doing that work are closer questions. As Defendant notes, Clyne began work on the BMC Negotiations six weeks before the April 20, 2015 email and the April 27, 2015 phone call in which the contingency agreement was allegedly formed. Clyne himself sought out the work. There is no indication in Clyne's April 20, 2015 email that he would stop work if an agreement were not reached. Given that Clyne was already performing the work, his position that IBM reasonably foresaw that he would rely on its promise to pay him the contingency rate is tenuous. Nonetheless, for the purposes of this Opinion, I assume that there are issues of fact as to the reasonably foreseeable inducement element of the promissory estoppel element.

As to actual reliance, the cases Plaintiff cites in its briefing for the proposition that continued employment supports the reliance element, are distinguishable or inapposite. *Moro v. Oregon*, 357 Or. 167, 198, 351 P.3d 1, 21-22 (2015) (challenge by Oregon PERS members to legislation reducing retirement benefits; no promissory estoppel claim or theory made or discussed), *petition for cert. filed*, (U.S. Apr. 10, 2017) (No. 16-1209); *Spitznass v. First Nat'l Bank*, 269 Or. 676, 688, 525 P.3d 1318, 1324 (1974) (retirement benefits case stating in *dicta* that in certain circumstances, continued employment might provide consideration for an implied promise to pay a pension; by discussing consideration, court appears to be discussing the "consideration" theory of promissory estoppel, not the indefinite promise theory), *Neiss*, 135 Or. App. at 229, 900 P.2d at 707 (the plaintiff gave up an optical practice in Portland and moved to Ashland in reliance on the defendant's promise regarding a future ownership opportunity; no discussion of whether continuing employment supports the reliance element of the claim).

However, in *Kraft*, Judge Papak discussed several cases and remarked that "the courts found employees foreseeably relied on their employers's promises by taking or remaining on the job." *Kraft*, 2008 WL 4866182, at *12. Although one of the cases he discussed was *Neiss*, which is distinguishable, and others had to do with retirement plans, I accept that Plaintiff can show actual reliance by the fact that he continued working on the BMC Negotiations after April 2015.

Nonetheless, I grant Defendant's motion because there is no evidence that Plaintiff made any change in position as a result of Defendant's promise. In *Kim v. Prudential Financial, Inc.*, No. 3:15-cv-02029-HZ, 2016 WL 6803082, at *5 (D. Or. Nov. 14, 2016), I explained that "[g]eneral forbearance from seeking job opportunities is not sufficient to show detrimental

reliance[.]" *Id.* In *Kim*, I also discussed *Houston v. Yoncalla School Dist. No. 32*, No. 6:13-cv-01318-AA, 2014 WL 3514984 (D. Or. July 11, 2014), where the plaintiff worked as a substitute teacher in reliance on a promise that the work would lead to a teaching contract. *Id.* When the defendant offered the teacher a contract for a substantially lower salary than the teacher had been led to believe would be offered, the teacher brought a promissory estoppel claim. *Houston*, 2014 WL 3514984, at *1. Judge Aiken dismissed the plaintiff's claim because the plaintiff, among other things, failed to allege that he rejected other salaried teaching positions or that he lost employment opportunities when he served as a substitute and thus failed to allege a sufficient change in position. *Id.* at *12.

Plaintiff here provides no evidence to support the detrimental reliance/substantial change in position element. The undisputed evidence is that Clyne had no other work and had begun performing work on the BMC Negotiations before Defendant promised the 1.2% contingency compensation. There is no evidence that Clyne or Plaintiff rejected other jobs or otherwise lost employment opportunities during the time he was working on the BMC Negotiations. Without any evidence of a substantial change in position made in reliance on Defendant's promise, the only reasonable inference is that Clyne was committed to working on the BMC Negotiations regardless of the promise. As a result, he does not create an issue of fact on the promissory estoppel claim and it is dismissed.

V. Fraud Claim

Plaintiff alleges that the representation made by Defendant that "it would compensate GEM on a 'bounty system' based upon a percentage of all savings and avoided costs that it obtained from a negotiation resolving IBM's dispute with BMC was knowingly false at the time

it was made, or was made with reckless disregard for its truth or falsity." Compl. ¶ 46. Plaintiff further alleges that at all material times, Plaintiff was ignorant of the falsity of the representation. *Id.* ¶ 47. Plaintiff asserts that IBM's representation was material and IBM intended for Plaintiff to rely on its truth when it made the representation. *Id.* ¶ 48. According to Plaintiff, Plaintiff not only had the right to rely on the truth of the representation, but actually relied on it and to its detriment, all to its economic damage in the amount of $13,388,402. *Id.* ¶ 49.

Defendant moves for summary judgment on the fraud claim based on two arguments. First, it contends that it did not promise to compensate Plaintiff on a contingent basis. Second, it contends that even if it had made that promise, there is no evidence that at the time the alleged promise was made, Calo lacked the intent that IBM would perform, or stated conversely, there is no evidence that Calo intended that IBM not perform. Defendant also argues that there is no evidence that any promise was made with reckless disregard as to whether IBM could or could not in fact perform. Defendant adds that for the reasons explained in connection with the promissory estoppel claim, Plaintiff cannot carry its burden to show justifiable reliance.

Under Oregon law, the elements of a fraud claim are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078, 1080 (1976) (internal quotation marks omitted). A plaintiff must establish each element of fraud by clear and convincing evidence. *Id.* Intent to defraud may be established by circumstantial evidence. *Lane Cnty. Escrow Serv., Inc. v. Smith*, 277 Or. 273, 280, 560 P.2d 608, 612 (1977).

Additionally, Plaintiff may establish fraud by showing that "at the time of the making of the promise, there was no present intention of performance *or, alternatively*, that the promise was made with reckless disregard as to whether the promissor could or could not perform." *Webb*, 274 Or. 387, 393 n. 2, 546 P.2d at 1080 n.2 (emphasis added).

Plaintiff argues that on summary judgment, when viewing the evidence in its favor, a reasonable juror could conclude that Calo accepted Clyne's April 20, 2015 proposal but secretly intended not to be bound until further steps were taken by legal, finance, and IBM Procurement which she then failed to initiate. Alternatively, Plaintiff argues that the evidence supports an inference that Calo was reckless about whether IBM could be bound absent approval by those departments. In support, Plaintiff notes that Calo never contacted anyone in any of those departments, did not communicate with APC, and never told Clyne that further steps were required for the agreement to be enforceable. Further, Plaintiff notes that in response to Clyne's July 10, 2015 email discussing the negotiations and expressing his concern about how he was going to get paid his "contingency fee" given the status of the negotiations, Calo responded with an email stating that she was "studying all you sent" and said nothing about the contingency agreement, thus lulling Plaintiff into believing an agreement was in place.

Plaintiff also notes that Calo did not affirmatively deny the existence of a contingency agreement even in the face of Plaintiff submitting no hours for payment or no travel reimbursement requests. Plaintiff additionally suggests that the evidence shows Calo was motivated to be "strategically ambitious" and to stay silent about the lack of an agreement because she lacked a budget to pay for Clyne and by allowing Clyne to operate under the assumption that he had a contingency agreement, she had zero risk of payment if negotiations

failed. Based on all of these facts, Plaintiff argues that a factfinder could determine that Calo never intended to pay on a contingency arrangement at the time she entered into the agreement with Clyne, or that at a minimum, she made the promise to pay him a contingency with reckless disregard as to whether IBM would or would not perform as promised.

Defendant again argues, as it has in regard to other claims, that the evidence establishes that Clyne knew of the legal, finance, and IBM Procurement requirements and further, that because Calo knew that Clyne had worked as an IBM contractor previously, she reasonably concluded that Clyne was aware of IBM's "onboarding" and contracting requirements. This, Defendant contends, undermines any inference of fraudulent intent. Further, Calo's failure to follow up with any of the internal IBM departments is because she never believed she and Clyne had an agreement. Defendant also notes that the July 10, 2015 email was multiple pages and contained only one sentence regarding the contingency agreement. Moreover, because it was not Calo's responsibility to receive submitted hours by Clyne if he were working through APC, the lack of such submission does not allow for a reasonable inference of fraudulent intent.

I agree with Plaintiff that when the facts are construed in Plaintiff's favor, a reasonable factfinder could conclude that Calo acted with fraudulent intent or in reckless disregard of the truth. As explained previously, the evidence does not conclusively establish that Clyne knew of the legal, finance, and IBM Procurement "onboarding" requirements. The July 10, 2015 email was not "multiple pages" long as Defendant suggests. It did have multiple paragraphs and the reference to the contingency agreement was only one sentence. But, that sentence began a new paragraph and it is not hidden or buried in other text as Defendant implies. Additionally, the reasonableness of Calo's belief about Clyne's knowledge of "onboarding" procedures and the

reasonableness of her belief about whether there was or was not an agreement are issues reserved for the factfinder.

Calo's silence in the face of Clyne's April 20, 2015 proposal and in the face of the reference to the contingency fee agreement in the July 10, 2015 email could reasonably suggest that she never intended to pay Clyne as promised. Her failure to contact IBM Procurement, legal, or finance herself, knowing as she herself states that approval by these departments would be required, is capable of creating that same inference. While Defendant's alternative interpretation of the evidence is also reasonable, it is not the only one and thus, on summary judgment, because a reasonable factfinder could conclude that Calo agreed to pay Clyne 1.2% on a contingency basis without the intent to do so, or that her promise was made in reckless disregard of whether IBM could or could not pay Clyne, Plaintiff has created an issue of fact on the issue of fraudulent intent.

Defendant next argues that Plaintiff fails to establish justifiable reliance. In a 2015 decision, the Oregon Court of Appeals explained that

> [t]he requirement that a plaintiff's reliance be justified serves as a balance between, on the one hand, the policy that a person who intentionally deceives another should not be allowed to profit from the deception and, on the other hand, the recognition that the person deceived, as an autonomous individual, should be responsible for protecting his or her own interests when making a decision.

*Vukanovich v. Kine*, 268 Or. App. 623, 634, 342 P.3d 1075, 1083 (internal quotation marks omitted), *opinion adhered to as modified on reconsideration*, 271 Or. App. 133, 349 P.3d 567 (2015). The *Vukanovich* court continued:

> Whether reliance on an alleged misrepresentation is justifiable turns on the totality of the parties' circumstances and conduct. Among other things, for reliance to be justifiable, the party claiming reliance must have taken reasonable precautions to safeguard [his or her] own interests under the particular circumstances of the case.

> What precautions a person must take to protect his or her own interests turns on the nature of the person's relationship with the person making the alleged misrepresentation, and that person's experience and sophistication with the type of transaction at issue, as well as with the subject matter of the misrepresentation.

*Id.* at 634-35, 342 P.3d at 1083 (citations and internal quotation marks omitted).  In another decision, the Oregon Court of Appeals explained that

> [r]easonableness is measured in the totality of the parties' circumstances and conduct. For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant who made active misrepresentations of fact on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, that particular plaintiff was justified in doing so.

*Merten v. Portland Gen. Elec. Co.*, 234 Or. App. 407, 417, 228 P.3d 623, 629 (2010) (internal quotation marks omitted).

For the reasons previously explained, when the evidence is considered in a light most favorable to Plaintiff, it does not establish as a matter of law that Clyne actually *knew* that his work on the BMC Negotiations was subject to the APC contracts, that he *knew* a contingency fee agreement had to go through IBM Procurement or that the agreement he reached with Calo would not go through IBM Procurement, or that he *knew* how the hiring of contractors worked. It is possible to construe the evidence that way, but it is not the only reasonable conclusion. Moreover, both parties are sophisticated negotiators and Clyne had allegedly been told by Patterson that he could trust Calo to the point of accepting an oral agreement.  Given that the standard is reasonableness and is determined based on the totality of both parties' conduct, this issue is reserved for the factfinder because reasonable but competing inferences may be drawn.

VI.  Estoppel/Waiver Affirmative Defenses

Having resolved Defendant's motion and Plaintiff's motion as to the express contract

affirmative defense, I turn to Plaintiff's motion against the estoppel and waiver affirmative defenses.  In its Answer, Defendant raises "estoppel/waiver" as a single affirmative defense even though they are distinct concepts.  Defendant generally asserts that at the time Clyne began working on the BMC Negotiations, Clyne knew that he had a preexisting contractual relationship with IBM through APC and that any different arrangement would have to be negotiated and approved by IBM Procurement.  Answer ¶ 57.  Defendant then specifically cites to Clyne's emails to Gargano stating that it was possible the "engagement" will not go through APC and further that APC was his vendor/employer of record and if that should change, he would notify Gargano immediately.  *Id.*  Defendant alleges that neither Clyne nor Plaintiff alerted Defendant to any change regarding their relationship with APC and they did not attempt to negotiate an alternative arrangement with IBM Procurement.  *Id.* at ¶ 59.  IBM asserts that in reliance on Clyne's statements and conduct, it allowed Plaintiff to continue to perform work on the BMC Negotiations.  *Id.* at ¶ 60.  As a result, IBM contends that Plaintiff and Clyne are estopped from recovering compensation pursuant to any contract other than the APC contracts.  *Id.* at ¶ 61.[7]

A.  Estoppel

A party may rely on the doctrine of estoppel to preclude the other party from asserting a right to recovery that the second party would have otherwise had if (1) the second party, through conduct or statements, made a false representation; (2) the party making the representation had

---

[7]  Other than the heading, the affirmative defense makes no mention of waiver.  However, in its response to the motion, Defendant more specifically asserts that Clyne, both expressly and by implication, waived two rights: (1) any right to contract directly with IBM; and (2) any right to a change order or amendment to the GEM SOW.  Def. Resp. 7-8, ECF 81.  Later in its Response, Defendant restates the second alleged waiver this way:  Plaintiff "waived any right to assert that because GEM did not receive a change order to the SOW for the BMC Negotiations[,] it was not obligated under the APC contracts to perform the work."  *Id.* at 14.

knowledge of the true facts; (3) the other party is ignorant of the true facts; (4) the party making

the representation intended for the other party to rely on it; and (5) the other party was induced to

act upon the false representations. *Day v. Advanced M & D Sales, Inc.*, 336 Or. 511, 518-19, 86

P.3d 678, 682 (2004). Applying the elements to this case, Defendant may estop Plaintiff from

payment based on a contingency agreement if (1) Plaintiff, through conduct or statements, made

a false representation that his work on the BMC Negotiations was under the APC contracts; (2)

Plaintiff knew the true facts (that he was not working under the APC contracts); (3) Defendant

was unaware of the true facts; (4) Plaintiff, in making the false representation, intended for

Defendant to rely on it; and (5) Defendant was induced to act upon the false representation by

continuing to have Plaintiff perform work on the BMC Negotiations.

In support of its motion, Plaintiff argues that the GEM-APC contracts did not prohibit

Plaintiff from directly contracting with IBM, prior approval by IBM Procurement was not a

precondition for Plaintiff's contingent fee services, and Defendant's acquiescence and failure to

timely object to Plaintiff's contingent fee proposal ratified that contingent fee agreement. In

response, Defendant argues that when viewing the evidence in a light most favorable to it, there

are at least issues of fact regarding the parties' contractual relationship with APC and thus,

summary judgment is inappropriate.

I agree with Defendant. As discussed, the facts are capable of supporting Plaintiff's

theory of the case regarding the relationship of the APC contracts to Clyne's work on the BMC

Negotiations. But, the same facts are just as capable of supporting Defendant's theory of the case

when drawing the inferences in Defendant's favor in analyzing Plaintiff's motion. A factfinder

could reasonably conclude that the APC contracts did control Clyne's work on the BMC

Negotiations.

Additionally, to support a ratification by acquiescence argument, Plaintiff would need to establish that Calo's silence about approval from IBM Procurement, legal, or finance was made with knowledge that such approval was required which in this case would be triggered by knowledge that a contingency agreement was formed. *See Summit Props., Inc. v. New Tech. Elec. Contractors, Inc.*, No. CV-03-748-ST, 2004 WL 1490327, at *16 (D. Or. July 2, 2004) (under Oregon law, "[s]ilent acquiescence *with full knowledge of the material facts* may amount to [an implied] ratification if continued for an unreasonable length of time[.]") (emphasis added; internal quotation marks omitted), *adopted by J. Haggerty*, 2004 WL 2642345 (D. Or. Nov. 19, 2004). Because, when crediting Calo's testimony as true, which must be done in analyzing Plaintiff's motion, she had no understanding from Clyne's April 20, 2015 email and her April 27, 2015 conversation with Clyne that they had agreed to anything, Plaintiff cannot rely on a ratification theory in support of its summary judgment motion.

Plaintiff raises an interesting argument in its Reply. The evidence is undisputed that Calo and Gargano did not discuss Clyne's status as an APC contractor or his compensation on a contingency agreement in connection with the work on the BMC Negotiations until after September 30, 2015. Gargano and Clyne discussed the work and the NDA issues directly. Calo and Clyne discussed the work and Calo received the April 20, 2015 email regarding the contingency agreement and discussed it with Clyne the next week. But, Gargano and Calo did not communicate about Clyne's NDA, his compensation generally or specifically for the BMC Negotiations, or his work for IBM being through APC. Calo had no knowledge of Clyne's communications with Gargano which are the foundation for Defendant's estoppel defense.

Plaintiff argues that based on these undisputed facts, Defendant cannot show that Calo actually relied on Clyne's allegedly false statements that his work on the BMC Negotiations was under the APC contracts. As a result, Defendant cannot establish that the allegedly false statements induced Calo into allowing Plaintiff to continue to work on the BMC Negotiations.

This argument was raised for the first time in Plaintiff's Reply and was not sufficiently briefed by both parties to allow the Court to fully analyze it. I agree with Plaintiff that its argument makes intuitive sense. But, I deny the summary motion as to the estoppel affirmative defense at this time. Plaintiff may renew the argument later with additional authority and when Defendant has an opportunity to respond.

B. Waiver

"Waiver is the intentional relinquishment or abandonment of a known right." *Ionian Corp. v. Country Mut. Ins. Corp.*, 88 F. Supp. 3d 1187, 1199 (D. Or. 2015). "Waiver may be implied by conduct, but there must be clear, decisive and unequivocal conduct which indicates a purpose to waive the legal rights involved." *Id.* (internal quotation marks omitted).

In its response to Plaintiff's motion, Defendant raises two waiver arguments. Defendant first contends that the APC contracts with Plaintiff or Clyne constitute an effective waiver of Plaintiff's right to payment under a contingency agreement because those contracts prohibited Plaintiff from directly contracting with IBM for work.

Defendant makes a second waiver argument which is less clear. As I understand it, Defendant contends that Plaintiff has waived its right to argue that the work on the BMC Negotiations was not under the APC contracts because there was no new statement of work (SOW) or a change order to a SOW. That is, according to Defendant, Plaintiff waived its right to

contend that without a new or amended SOW or change order to the SOW, the APC contracts did not govern and Clyne was free to perform the BMC Negotiations work under a contingency agreement. The conduct allegedly constituting this waiver is (1) Plaintiff's failure to initiate a new SOW or change order itself which Defendant contends Plaintiff was obligated to do under the APC contracts, and (2) before the BMC Negotiations, Plaintiff submitted hours for four different projects under Plaintiff's APC contracts and the existing SOW without requesting a change order or an amended SOW.

As to the first waiver argument, I need not spend much time detailing the non-compete provisions in either the MSA or the January 2014 Confidentiality/Non-Compete Agreement. Assuming both of the non-compete provisions applied to Plaintiff at the time Clyne started work on the BMC Negotiations, it cannot be disputed that these were agreements between APC and Plaintiff/Clyne. IBM was not a party to either agreement. Plaintiff argues that because IBM was not a third-party beneficiary to these agreements, it cannot enforce them against Plaintiff. As a result, Defendant cannot rely on these agreements to contend that Plaintiff voluntarily relinquished a known right that it had vis-à-vis Defendant. Defendant dismisses this argument by explaining that it is not trying to *enforce* these agreements against Plaintiff but rather, the very fact that Plaintiff signed agreements pledging it would not compete with APC for an APC client's business is a waiver of Plaintiff's right to contract directly with IBM.

I disagree with Defendant. Even if Defendant is not actually seeking to enforce the non-compete provisions against Plaintiff, Defendant cannot show that by signing non-compete agreements with *APC*, Plaintiff intentionally relinquished a right to contract directly with *IBM*. The non-compete provisions exist to protect APC, not IBM. Although waiver may be implied by

conduct, the conduct must clearly, decisively, and unequivocally show that Plaintiff intended to waive a right to make an independent payment agreement with IBM. As a matter of law, signing agreements with one party is not clear, decisive, and unequivocal conduct of an intent to relinquish a right against another party. As a result, Defendant cannot prevail on this part of its waiver defense.

Defendant's second waiver argument is based on Defendant's reading of provisions in the MSA which essentially state that (1) an APC Supplier, meaning Plaintiff, is not obligated to provide services unless it accepts a SOW and APC authorizes the work under a Work Authorization; (2) APC will issue a SOW which the Supplier/Plaintiff is under no obligation to accept; (3) modifications to SOWs may occur when the Client/IBM or APC request a change to the terms or scope of a particular engagement which may impact a particular SOW and Work Authorization; and (4) if this occurs, the Supplier/Plaintiff must promptly review the requested change and notify APC of the impact of the changes. Stewart First Decl. Ex. 3 at 1, 2, ¶¶ 2.2, 2.3.

Defendant argues that read together, these MSA provisions establish that "the onus was on GEM, as the Supplier, to timely inform APC if GEM believed that a request for work by IBM was outside the terms or scope of the engagement in a way that might impact GEM's SOW or Work Authorization." Def. Resp. 12-13. This construction is inconsistent with the plain language of the provisions. Section 2.3 of the MSA unambiguously states that the "Client [IBM] or APC may request a change to terms of an Engagement which may impact a particular Statement of Work and Work Authorization." Stewart First Decl. Ex. 3 at 2, ¶ 2.3. Only then does the Supplier have an obligation to review the changes and discuss any impacts with APC.

The record here is devoid of any evidence that IBM or APC requested a change to the terms of Plaintiff's "Engagement" and thus, Plaintiff was under no obligation to notify APC of any change or impact of such change. Therefore, Plaintiff's failure to initiate a new SOW or change order does not constitute a waiver of its right to argue that a new SOW or change order was required for the BMC Negotiations work to be governed by the APC contracts.

Defendant next argues that Clyne's work on four different projects under his existing SOW without requesting a change order or amended SOW establishes Plaintiff's voluntary relinquishment of the right to argue that a change order or amendment to the SOW was required for the BMC Negotiations work to be governed by the APC contracts. This argument fails for the same reason as the previous argument: the MSA does not require Plaintiff to initiate a change order or an amendment to the SOW. Therefore, Plaintiff's acceptance of new assignments directed by Cohen without requesting a change order does not waive its right to receive a new SOW or change order in the future. Because the contract language does not put the burden on Plaintiff, IBM cannot show that Plaintiff's work under the APC contracts without a change order constitutes an intentional relinquishment of a right to receive a change order or SOW amendment in the future.

Finally, Defendant suggests that because Clyne worked for six weeks on the BMC Negotiations before sending his April 20, 2015 email to Calo, he was therefore working under the APC contracts during that time, and as a result Plaintiff waived its right to argue that a change order or new SOW was required for the BMC Negotiations work to be governed by the APC contracts. However, the undisputed evidence is that Clyne talked to Patterson about a contingency fee agreement before he began work on the BMC Negotiations. With that, his initial

six weeks of work on the BMC Negotiations is not clear, decisive, and unequivocal conduct capable of establishing an intentional relinquishment of a right to negotiate a contingency agreement with IBM for the work he performed on the project. Plaintiff's motion for summary judgment on the waiver affirmative defense is granted.

## CONCLUSION

Defendant's motion for summary judgment [71] is granted as to the breach of express contract claim, the implied covenant of good faith and fair dealing claim, and the promissory estoppel claim. The motion is denied as to the quantum meruit and fraud claims. Plaintiff's motion for partial summary judgment [76] is granted as to the waiver affirmative defense. The motion is denied as to the express contract and estoppel affirmative defenses and is denied as moot as to the unclean hands affirmative defense. Based on the parties' representations in the briefing, Plaintiff's accounting claim and Defendant's unclean hands affirmative defense are dismissed.

IT IS SO ORDERED.

Dated this \_\_\_18\_\_\_ day of \_\_\_May_____, 2017

Marco A. Hernandez
United States District Judge